## V. VIVAUDOU, Inc., v. FEDERAL TRADE COMMISSION.

### No. 3.

Circuit Court of Appeals, Second Circuit.
Nov. 2, 1931.

Olvany, Eisner & Donnelly, of New York City (Mark Eisner, of New York City, of counsel), for petitioner.

Robt. E. Healy, Chief Counsel, Martin A. Morrison, Asst. Chief Counsel, and Edward L. Smith, all of Washington, D. C., for respondent.

Root, Clark & Buckner, of New York City (Grenville Clark and Joseph Schreiber, both of New York City, of counsel), amici curiæ.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The complaint against the petitioner is that it, a Delaware corporation, with its principal place of business in New York and engaged in the business of manufacturing cosmetics and selling them in interstate commerce throughout the United States, acquired on December 31, 1925, and still owns, all the outstanding capital stock of the Alfred H. Smith Company, a New York corporation, with its principal place of business in New York City, and also engaged in interstate commerce in the preparation and sale of cosmetics. It is said that the effect of this acquisition is to substantially lessen competition between the two companies, to restrain commerce in cosmetics in certain sections or communities, and tends to create a monopoly of cosmetics in the petitioner. The complaint charges also, that on November 17, 1926, the petitioner organized the Parfumerie Melba, Inc., a New York corporation, with its principal place of business in the city of New York, and that at the time of its organization it acquired and still owns all the capital stock of that company; that on December 31, 1926, the Parfumerie Melba, Inc., purchased as a going concern the cosmetic business of the Melba Manufacturing Company, an Illinois corporation, engaged in manufacturing and distributing cosmetics in interstate commerce throughout the country. The effect of this acquisition, it is charged, was to substantially lessen competition between the petitioner and the Parfumerie Melba, Inc., to restrain commerce in certain communities, and to tend to create a monopoly in the petitioner. After hearings, the Commission issued the order appealed from.

The Commission found that the petitioner is engaged in interstate commerce, selling its branded products throughout the United States, and that it is an important factor in the industry of selling extracts, talcums, rouges, creams, nail preparations, and similar cosmetics; that in 1925 its net sales amounted to $3,134,785.28, and in 1926, $2,897,346.91. One of its competitors was the Alfred H. Smith Company, whose net sales in 1925 amounted to $2,492,129, and in 1926, $2,501,379.52. It was found to be in competition with the petitioner in the same line of cosmetics. At the time of the acquisition of the Smith Company's stock, the petitioner sold the following lines: Mavis, Narcisse de Chine, La Boheme, Jasmin-Arly, Lilas Arly and Mai D'Or, and Myrurgia. The acquisition of the Smith Company gave petitioner control of two lines of that company known as Djer-Kiss and Kadorys. The acquisition of the Parfumerie Melba, Inc., gave it the Melba lines of Lov Me, Bouquet, Fleurs, Ador-Me, and Melba. The Melba Company did a business in 1926 of $1,872,141.33.

It was found that after obtaining control of both the Smith Company and the Parfumerie Melba Company, in the manner described, the business of these companies was operated under the supervision and control of the petitioner. The selling organization and business of the Melba Manufacturing Company was taken over by the Parfumerie Melba Company. Its property was moved from its principal place of business in Chicago to the factory of the petitioner in New York City, and there indiscriminately used by the petitioner in the manufacture of its products and that of the Smith Company and the Parfumerie Melba Company. The property of the Smith Company was also moved to the petitioner's plant in New York City and indiscriminately used in the manufacture of petitioner's products. The Commission concluded that there was a violation of section 7 of the Clayton Act (15 USCA § 18) by the acquisition and continued ownership of these companies, as described, and that this substantially lessened competition between the companies, restrained commerce throughout the United States, and tended to create a monopoly in the petitioner of perfumes, toilet waters, face powders, cosmetics, and other toilet articles. The order directs that within 90 days, the petitioner divest itself in good faith of the stock thus owned by it of the Parfumerie Melba, Inc., and the Alfred H. Smith Company, with directions to report within four months in writing, setting forth in detail the manner and form in which the order has been complied with.

It appears from the record that the business done by the three corporations in 1926 amounted to $7,270,866, out of a total throughout the United States of $173,000,000, as testified by one witness, and $125,000,000, at American manufacturers' prices, by another witness, the latter quoting from the Census Bureau figures.

The question presented on this appeal is whether the competition between these companies has been substantially lessened by reason of the stock acquisition and ownership referred to, and whether the public has been injuriously affected. Section 7 of the Act (38 Stat. 730, 731, section 18 U. S. C. title 15 [15 USCA § 18]) provides:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce. * * *

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."

The test was recently stated in International Shoe Co. v. Commission, 280 U. S. 291, 50 S. Ct. 89, 91, 74 L. Ed. 431, where the court said, referring to ownership of stock condemned under section 7 of the Clayton Act: "Mere acquisition by one corporation of the stock of a competitor, even though it result in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree, Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 357, 42 S. Ct. 360, 66 L. Ed. 653; that is to say, to such a degree as will injuriously affect the public. Obviously such acquisition will not produce the forbidden result if there be no pre-existing substantial competition to be affected; for the public interest is not concerned in the lessening of competition, which, to begin with, is itself without real substance."

This court may review this record to determine whether the evidence requires a con-

trary conclusion to that arrived at by the Commission as to the effect of the acquisition of the stock of the Smith Company and the Parfumerie Melba, Inc., in substantially lessening competition. We must consider the extent of the trade carried on by the three companies and compare it with the volume of business carried on by their competitors previous to the period of ownership of the stock, and endeavor to ascertain whether the public interest has been affected. In Federal Trade Commission v. Curtis Co., 260 U. S. 568, 43 S. Ct. 210, 212, 67 L. Ed. 408, it was held that the court must inquire whether the Commission's findings of fact are supported by the evidence, and, if so supported, they are conclusive. At the same time, however, the Supreme Court pointed out that the statute granted jurisdiction to the courts to make and enter "upon the pleadings, testimony and proceedings, a decree affirming, modifying or setting aside the order," and stated that the court must also have power to examine the whole record and ascertain for itself the issues presented and whether there are material facts not reported by the Commission. The court concluded: "If there be substantial evidence relating to such facts from which different conclusions reasonably may be drawn, the matter may be and ordinarily, we think, should be remanded to the commission—the primary fact-finding body—with direction to make additional findings, but if from all the circumstances it clearly appears, that in the interest of justice the controversy should be decided without further delay, the court has full power under the statute so to do. The language of the statute is broad and confers power of review not found in the Interstate Commerce Act."

■ In Federal Trade Commission v. Sinclair Co., 261 U. S. 463, at page 476, 43 S. Ct. 450, 454, 67 L. Ed. 746, referring to the Clayton Act, the court pointed out that the purpose of the statute was "to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain," and it has been held that the purpose of the Clayton Act (38 Stat. 730) is to prevent at incipiency forms of combination which the Sherman Law (15 USCA § 1 et seq.) might not reach until the evil existed. Standard Oil Co. v. Federal Trade Comm., 282 F. 81, 87 (C. C. A. 3). Therefore, if the acquisition of the stock which in turn brought to the petitioner the business of each company is not

of sufficient moment from the standpoint of the public interest to warrant the conclusion that it substantially lessened competition, such acquisition would not be violative of the prohibition of section 7 of the Clayton Act (15 USCA § 18). There can be no monopolistic tendency in acquiring control of properties which added four million dollars to the petitioner's already three millions' volume of business, when the total of the country's similar business, amounting to at least one hundred and twenty-five million, is considered. In Standard Oil Co. v. Federal Trade Comm., the Circuit Court of Appeals for the Third Circuit said: "Therefore in determining whether given acts amount to unfair methods of competition within the meaning of the Federal Trade Commission Act [15 USCA §§ 41–51], or substantially lessen competition and tend to create a monopoly within the meaning of the Clayton Act, the only standard of legality with which we are acquainted is the standard established by the Sherman Act in the words 'restraint of trade or commerce' and 'monopolize, or attempt to monopolize,' and by the courts in construing the Sherman Act with reference to acts 'which operate to the prejudice of the public interest by unduly restricting competition or unduly obstructing the due course of trade,' and 're-strict the common liberty to engage therein.' "

We have referred to the figures as to net sales. In addition, it appears that there are from 300 to 500 different perfumery and cosmetic manufacturers throughout the United States, 3,000 face powder manufacturers, each claiming individual odors and most of them having their own trade-names. Indeed, the products of the corporations which the petitioner now controls through stock ownership, as well as its own products, are sold under trade-names.

■ Unless there be a monopoly or tendency toward monopoly, we would not be warranted in concluding that the public had an interest as referred to in the statute. There is no evidence of increase in price brought about through the ownership of the stock or supervision of the companies, nor is there evidence of elimination of any of the lines of production, or curtailment of the same, nor evidence of divisions of territory. The effect seems to have been to increase the sales of the products of the three companies. The country at large was more thoroughly canvassed, and effort was made to sell the articles as branded by each company. Each company

has its separate sales force with men who handle their respective lines to the exclusion of others. There has been no increase in the cost of distribution nor enhancement of price, and we think that no injury has resulted to the public. This method of selling has been found unobjectionable and not injurious to competition. Temple Coal Co. v. Federal Trade Comm., 51 F.(2d) 656 (C. C. A. 3).

■ It appears that in 1925, out of a total of $3,482,000, it was found that two-thirds of its business consisted of talcum powders and $61,000 in compacts, whereas the Smith Company business was $786,000 in compacts and $480,000 in extracts, and apparently it was the desire of the petitioner to obtain the Smith Company's greater volume of business in these respective articles. An officer of the petitioner explained that "upon coming into control of the Vivaudou Company we found ourselves with a condition where most of our business was done on one item, Mavis talcum. Our extract business, our compact business and our cream business was very, very small. Try as we would we could not increase it very much. We therefore purchased the Djer-Kiss line, because in the Djer-Kiss line its main strength lay in the extracts and compacts which we were lacking." And, in explaining the reason for the purchase of the Melba line, he stated: "Upon acquiring control of Djer-Kiss we found ourselves with strong talcum and sundries, extracts, compacts. Our cream end of the business was very weak." The Melba strength lay in its creams. "We therefore purchased the Melba Company to completely round out the entire picture." The Melba cream business was about 75 per cent. of the total business of all the companies. It is properly claimed that, in view of this division of the toilet article business, the competition between these companies was not substantial and the acquisition did not substantially lessen competition in view of the respective volumes of sales. Moreover, the testimony justifies the claim that the customer purchased under the trade-name, indicating her preference by that name. As said in International Shoe Co. Case, supra: "The existence of competition is a fact disclosed by observation rather than by the processes of logic; and when these officers, skilled in the business which they have carried on, assert that there was no real competition in respect of the particular product, their testimony is to be weighed like that in respect of other matters of fact. And since there is no testimony to the contrary and no reason appears for doubting the accuracy of observation or credibility of the witnesses, their statements should be accepted."

In the case at bar, there are distinctive odors, formulæ and trade-marks as testified to. The formulæ create the odor and the odor is attached to the trade-mark. These factors are involved in the competition which existed before the purchase of the stock, and necessarily are involved in the subsequent competition during the period of ownership of the stock of the other corporations by the petitioner. Yet there is a lack of competitive quality and quantity in the lines of articles produced by the petitioner, Smith Company, and the Parfumerie Melba, Inc. The total volume of net sales and therefore the business carried on by these companies is not substantial when it is considered that at least $125,000,000 worth of these products are annually sold.

In Aluminum Co. v. Federal Trade Comm. (C. C. A.) 284 F. 401, 407, referred to by respondent, two competitors agreed to form a second company and each participate in the stock ownership of the new company. In that case, the court said: "Prior to February 17, 1918, the Cleveland Company had been engaged in competition with the Aluminum Company. On that day it agreed with the Aluminum Company to organize, and later there was organized, a third corporation, which was to purchase, and later did purchase, the aluminum rolling mill and also the 'aluminum rolling mill business' of the Cleveland Company. This finding of the Commission is sustained by the record which includes an agreement between the two old corporations for the sale by the Cleveland Company to the new corporation not of its rolling mill alone but its accounts receivable. * * * "

The court found monopoly features in this merger and said that the Aluminum Company was the dominant factor in the aluminum industry and produced one-half of the pig aluminum and aluminum ingots made in the world and all that was made in the United States. "In the domestic field, one substantial competitor * * * arose before the war; but during the war it succumbed to financial difficulties and its properties were purchased by the Aluminum Company." Moreover, it was found that the Aluminum Company and its subsidiaries produced one-half of the sheet aluminum made in the world and, prior to the war, produced all the sheet aluminum made in the United States. In the instant case, there is no such proof of public

interest adversely affected by reason of either the purchase of the Melba Manufacturing Company in the manner described or of the stock of the Smith Company, nor was there a substantial lessening of competition.

Order reversed.