(No. 21789.—)

THE MOODY & WATERS COMPANY, Plaintiff in Error, *vs.* THE CASE-MOODY PIE CORPORATION *et al.* Defendants in Error.

*Opinion filed October 21, 1933—Rehearing denied Dec. 8, 1933.*

SANDERS, CHILDS, BOBB & WESCOTT, and POPPEN-
HUSEN, JOHNSTON, THOMPSON & COLE, (DWIGHT S. BOBB,
and WILLIAM L. BOURLAND, of counsel,) for plaintiff in
error.

CHARLES R. BROWN, and JUDAH, REICHMANN, TRUM-
BULL & COX, (ALEXANDER F. REICHMANN, of counsel,)
for defendants in error.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error filed its bill in the circuit court of Cook
county seeking to set aside a contract entered into between
it and three other corporations, defendants in error. The
bill also prays cancellation of a certain warranty deed exe-

cuted by plaintiff in error to the defendant in error the Case-Moody Pie Corporation, the return of all plaintiff in error's physical assets in possession of said defendant in error and an accounting for such property as cannot be returned. The cause was referred to a master in chancery, who heard evidence and reported, recommending that the prayer of the bill be granted. Exceptions to the master's report were sustained by the chancellor and the bill was dismissed for want of equity. A freehold being involved, plaintiff in error brings the cause here by writ of error.

A very large amount of evidence was received. A resume of it cannot be given within the confines of this opinion. Certain facts are not disputed. In the main they are as follows: On and prior to June 28, 1929, the date of the contract here under consideration, the plaintiff in error and the Case & Martin Company, the Patterson Pure Food Pie Company and the Pellar Pie Company, each an Illinois corporation, were engaged in active competition in the business of manufacturing pies in the city of Chicago, and selling them at wholesale. There were three other corporations (the Chicago Pie Company, the Pie Bakeries of America and the Sunkist Pie Company,) also engaged solely in the manufacture and wholesale disposition of pies. In addition there were about two thousand retail bakers in the Chicago area and some seven or eight other pie bakeries manufacturing pies which they sold to grocery stores and the delicatessen trade, making delivery thereof by trucks, the number of pies sold by a single bakery ranging from 60 to 4000 per day. Edmunson & Bock were manufacturing, selling and delivering from 3700 to 11,500 pies per day though operating no trucks. It appears, also, that for at least a portion of the time between the making of this contract and the filing of the bill at the April term, 1931, certain wholesale pie companies of the city of Milwaukee were engaged in selling pies to the trade in the Chicago area. In the autumn of 1928 an agreement was

proposed for the creation of what was to be called the "Chicago Pie Bakers Credit Association." This proposed agreement recited that certain bad trade practices and abuses had arisen in the trade which were injurious and harmful and that the parties were desirous of eliminating such harmful and injurious practices and abuses. This agreement provided that the association to be formed meet once a week and discuss ways and means to improve the quality and increase the consumption of pies in Chicago and that its members discontinue certain practices which had been used to secure trade. This agreement, however, was not signed. Later, at the suggestion of one Wedding, a meeting was called of plaintiff in error and the three companies defendants in error herein named. At this and later meetings vicious trade practices were discussed. It was also there disclosed that some of the companies were losing money or making but little, if any, and that the profit of all had been reduced. The means of saving in event of consolidation was also discussed. As a result of these meetings a contract was entered into on June 28, 1929, providing for the creation of a new corporation under the laws of Illinois, to which the consolidating corporations should transfer all of their assets devoted to the pie business except certain items mentioned. The contract provided for the means of this transfer. It was also provided that the new company to be created should give its note for the current net worth of the property transferred to it, and that for good will and certain remaining assets of the consolidating corporations transferred the new corporation was to issue its preferred and common shares of stock to the consolidating corporations or to their stockholders in accordance with the table set out in the contract, and that certain shares of common stock should be issued to the investment bankers for their services in connection with the consolidation. The contract provided that until certain of the securities of the new corporation were offered to the public for financing,

the stock of the new corporation should be held by five trustees, one to be designated by each of the consolidating corporations and one designated by the bankers. These trustees were to issue certificates to evidence the title of the shareholders in the stock. The voting trust was to terminate at the end of five years. The contract designated the officers and directors of the new corporation. These were to be certain of the officers and directors of the consolidating corporations. The contract provided for appraisal of the property by the consolidating corporations. Two supplemental contracts were entered into, one construing certain provisions of the original contract and the other providing that for a period of ten years the consolidating corporations would not engage in the pie business in competition with the new corporation within the city of Chicago or within a radius of one hundred miles therefrom, and provided that if any of the signers of that supplemental contract were discharged or his salary greatly reduced by the new corporation he should be no longer bound by that supplemental contract. Upon signing the consolidation contract defendant in error the Case-Moody Pie Corporation was formed, and each of the constituent companies called special meetings of their respective stockholders, who approved the consolidation by more than a two-thirds majority of the capital stock. Plaintiff in error's stockholders voted unanimously in favor of the consolidation. Thereafter the transfers of the assets of the four constituent companies were made, and the stock of the new company was issued to the constituent companies or their stockholders, as the latter chose. C. H. Moody, of the plaintiff in error company, became vice-president of the Case-Moody Pie Corporation at a salary of $25,000 per year. He attended all the meetings of the directors of the Case-Moody Pie Corporation and participated in the conduct of its business until March 9, 1931. The investment bankers who assisted in the transaction were Ames,

Emerich & Co., who received 10,000 shares of the common stock of the new corporation as their compensation.

It is alleged in the bill that the contract was illegal and void as contravening the statutes of the State of Illinois, in that it tended to create a monopoly and constituted a combination to fix or limit the quantity of the commodity to be manufactured, and was illegal as in restraint of trade. Several issues of fact were tendered by the answer, one of which relates to the percentage of the entire business of the manufacture and sale of pies done by the four consolidating companies, it being alleged that there were some eighteen companies who were in direct competition with defendants in error and that some two thousand more bakeries were doing business in the city of Chicago, each producing ten or more pies per day. An issue of fact was tendered, also, as to the purpose for which the consolidation took place, it being in the answer alleged that some of the companies were losing money, and that the contracts were entered into solely for the purpose of effecting economy in operation, reducing waste and doing away with certain vicious trade practices arising out of the business. The answer also alleged that plaintiff in error and its officers, directors and stockholders, being parties to the contract, are estopped to question its validity, and that plaintiff in error came into equity with unclean hands. Counsel for plaintiff in error assert, and those for defendants in error deny, that the record supports a conclusion that the consolidation effected was for the illegal purpose prohibited by the statute.

The anti-trust statutes of this State are found in the Criminal Code. Cahill's Stat. 1931, chap. 38, pars. 598-605.

"Par. 598. *Trusts, pools and combines defined—conspiracy.*] Sec. 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* If any corporation organized under the laws of this or any other State or country for transacting or conducting any kind

of business in this State, or any partnership or individual or other association of persons whosoever, shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, partnership, individual, or any other person, or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of or a party to any pool, agreement, contract, combination or confederation to fix or limit the amount or quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this State, such corporation, partnership or individual or other association of persons shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to indictment and punishment as provided in this act.

"Par. 599. *Issue of trust certificates and organization of combinations prohibited.*] Sec. 2. It shall not be lawful for any corporation to issue or to own trust certificates, or for any corporation, agent, officer or employees, or the directors or stockholders of any corporation, to enter into any combination, contract or agreement with any person or persons, corporation or corporations, or with any stockholder or director thereof, the purpose and effect of which combination, contract or agreement shall be to place the management or control of such combination or combinations, or the manufactured product thereof, in the hands of any trustee or trustees, with the intent to limit or fix the price or lessen the production and sale of any article of commerce, use or consumption, or to prevent, restrict or diminish the manufacture or output of any such article."

Paragraphs 600 and 601 provide the penalties for violation of the act, and paragraph 602 provides that any contract or agreement in violation of any provision of the act shall be absolutely void.

Plaintiff in error seeks reversal of the decree of the circuit court on the ground that the consolidation of the four

companies was illegal, and that the master's conclusions of fact concerning the intent with which the consolidation took place are sustained by the evidence. It is also urged by counsel for plaintiff in error that the consolidation contract violated section 7 of the Corporation act, (Cahill's Stat. 1931, chap. 32,) concerning the power of a corporation to acquire, hold, vote, pledge or dispose of the stocks, bonds or other evidences of debt of another corporation.

The first question presented is whether this consolidation contract violates the anti-trust statutes of this State. It is conceded that agreements in partial restraint of trade are valid, but it is contended here that this consolidation was for the purpose of regulating or fixing the price of pies and their amount or quantity and of stifling competition, and that the arrangement was made entirely for that purpose. There is no evidence in the record to show that in the conferences had prior to the execution of the consolidating contract the matter of fixing, controlling or regulating the price of pies in Chicago, limiting their production or stifling competition was discussed. It is clear, also, both from the record and a consideration of generally known facts, that these four companies could not, if they chose, prevent competition in the pie trade. It was shown by the evidence, and is likewise a matter of common knowledge, that the ingredients used in the manufacture of pies may be at any time purchased in unlimited quantities in the open market, and it is shown that at the time of and prior to the execution of this contract the supply of such commodities was greater than the demand. Counsel stipulate that during the period of the operation of the Case-Moody Pie Corporation the market has been glutted with materials out of which pies are made. It is likewise true that machinery for the manufacture of pies was at all times to be had in the market. The evidence shows that some of the smaller manufacturers used little or no machinery but that they could produce as many as five thousand pies

per day by hand or on a "crust-roller." Likewise the wagons, trucks and other vehicles and machinery used in the business were at all times to be had in the open market. The evidence is undisputed, also, that competition against the four contracting companies has constantly increased since the consolidation, and that at times the prices of pies were reduced by the Case-Moody Pie Corporation owing to a reduction of such prices by its competitors.

Counsel for plaintiff in error argue that prior to the consolidation the four competing companies were doing sixty-five per cent of the wholesale pie business in the Chicago area, while counsel for defendants in error argue from their analysis of the evidence that they were not doing to exceed forty per cent of that business. However that may be, it is clear from the evidence that competition continued and that other pie companies started in the business subsequent to the consolidation. The evidence also shows that the Case-Moody Pie Corporation conducted its business along the same general lines as the four consolidating companies had operated; that the price of its pies shifted from time to time, and that it secured its orders and made its deliveries in the same manner which had been the practice of the four constituent companies.

Counsel for plaintiff in error argue, however, that the test to be applied in determining whether the consolidation contract violates the anti-trust laws of this State is whether, by the nature of the contract and the intent of the parties at the time the contract was made, it appears that such contract was a combination or federation to fix or limit the amount of the quantity of any article, commodity or merchandise to be manufactured, and that evidence of how it worked out is in nowise of influence on that question. They say that a contract establishing an illegal restraint of trade is void as of the time of its execution, and this notwithstanding later events showed that the plan of the combination did not work out as intended. It can

not be doubted that the purpose of the anti-trust acts of this State is to prevent undue restraint of trade and to maintain in the public interest an appropriate freedom of competition, thus avoiding the injuries to the public arising out of a monopoly. It is not intended by the act to prevent normal and fair expansion of business nor the use by an industry of reasonable protection against destructive practices in the trade. The test to be applied is whether such contracts and combinations by their inherent nature operate to the prejudice of the public interest by unreasonably restricting competition or obstructing the course of trade. Such contracts are within the inhibitions of the anti-trust laws of this State. The fact that such a contract incidentally restrains competition or trade does not of itself show a violation of the statutes if it does not unreasonably do so and its chief purpose is to promote an increase of the business of those who enter into it. Agreements in general restraint of trade are void, but those in reasonable partial restraint, founded upon a valid consideration, may be sustained where such corporations are not engaged in a public business. (*Southern Fire Brick Co.* v. *Garden City Sand Co.* 223 Ill. 616.) A combination which gives a practical monopoly in a business to the detriment of the trade generally, violates the anti-trust statutes of the State. (*Consumers Coffee Stores* v. *Commerce Com.* 348 Ill. 615; *Hall* v. *Woods,* 325 id. 114.) The public policy of the State, as declared by section 22 of article 4 of the constitution, is not opposed to the elimination of competition in all cases, but applies only where a monopoly, in the sense in which the word was used at common law, will be created—that is, where competition is eliminated by conferring upon a specified person or corporation the right to exclude all others from engaging in the same business in the same field of operation, or where such agreements or consolidations place it within the power of certain individuals or corporations to control the production and fix prices, thereby resulting

in injury to the public. (*Public Utilities Com.* v. *Romberg,* 275 Ill. 432.) Cases cited by counsel for plaintiff in error in support of their contention have been those where contracts falling within such classification have been considered. As was said by this court in *Harding* v. *American Glucose Co.* 182 Ill. 551, the test is whether the necessary consequence of the combination is the controlling of prices or limitation of production or suppressing of competition in such a way as to create a monopoly. In the application of this test, evidence of the operation of such combination after it is formed is competent to aid in the determination of the question whether the necessary consequence of the combination is the controlling of prices or limitation of production or suppressing of competition in such a way as to create a monopoly.

In *Appalachian Coals Co.* v. *United States,* 77 U. S. L. ed. 625, the United States Supreme Court noted the fact that the operation of the combination there attacked under the Sherman Anti-trust act had not progressed to a point that would afford evidence that in its operation the combination violated the act, and entered its judgment sustaining the contract, without prejudice to the government, however, to later proceed if it was found that in its operation the combination did violate the act. The Sherman Anti-trust act is not essentially different from the act herein quoted, and the decisions of the Supreme Court of the United States, while not binding upon this court, are of persuasive weight. In the *Appalachian Coals Co. case* the court considered a suit to enjoin a combination alleged to be in restraint of inter-state commerce in bituminous coal and to be an attempted monopoly within that commerce. The court, in an analysis of the evidence, stressed the fact that no attempt was made to limit production or control prices. It was there also pointed out that the more serious question in the case was not the effect of the combination on competition between the contracting parties but between

them and other producers. It was there observed that the fact that a combination for the correction of abuses may tend to stabilize a business or produce fairer price levels does not mean that the abuses should go uncorrected or that a coöperative effort to correct them necessarily constitutes unreasonable restraint of trade, but that, on the other hand, putting an end to injurious practices is not an unworthy aim and may be entirely consonant with public interest where the contracting parties must still meet effective competition in a fair market and neither seek nor be able to bring about a domination of prices. The test was in that case stated to be not simply whether the parties have restrained competition between themselves but as to the nature and effect of that restraint.

Counsel for plaintiff in error argue that the *Appalachian Coals Co. case* is not applicable here, because, they say, there were in that case numerous conditions in the trade justifying the combination which are not present in the case before us. In applying the test of legality to a combination of this character the particular conditions and purposes shown must be closely scrutinized. As was said in the *Appalachian Coals Co. case,* "the mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it." Every combination wherein one person purchases a business of the same kind of another ends competition between the parties and so necessarily lessens competition, but so long as the property or the trade remains such that fullest opportunity for competition exists and others may go into the business without having to meet a monopoly in that business or in the machinery or materials necessary to that business, it cannot be said that such combination results in an unreasonable restriction of competition. It is clear from the record, as we have observed, that there is no evidence of an attempt to fix or regulate the price of pies or the amount or quantity to be produced. It is equally clear not only that com-

petition continued after the formation of the Case-Moody Pie Corporation, but that the commodities and machinery going into that business cannot by their nature be monopolized. It seems clear, therefore, that there is here no violation of the anti-trust sections of the Criminal Code.

Counsel for plaintiff in error also urge that the acquisition of the stock of the Case-Moody Pie Corporation by the four consolidating corporations violated the provisions of section 7 of the Corporation act. As we have stated, the stock of the new corporation was issued either to the consolidating corporations themselves or their stockholders, as they chose. Section 7 deals with the power of a corporation to hold stock in other corporations and prescribes the limitations on that power. "(1) No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation, where the effect of such acquisition may be substantially to lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain trade in this State or in any section or community thereof, or tend to create a monopoly. (2) No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations where the effect of such acquisition or the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain trade in this State or in any section or community thereof, or tend to create a monopoly." This section recognizes the power of a corporation to hold, vote, pledge or dispose of the stocks or evidences of indebtedness of another corporation but places limitations upon that power. That the effect of the consolidation of these pie companies has not been to restrain trade or tend to create a monopoly is shown by the record.

Counsel for plaintiff in error argue as to the application of section 7, that the effect of this contract was to substantially lessen competition between the corporation whose stock is acquired—that is, the Case-Moody Pie Corporation—and the corporation making the acquisition—that is, the consolidating corporations—and so is in violation of the section quoted. In this case the Case-Moody Pie Corporation acquired no stock of the consolidating corporations. They sold to it certain of their assets and took promissory notes in payment therefor, and they or their stockholders acquired stock of the Case-Moody Pie Corporation in payment for good will. The Case-Moody Pie Corporation, and not the contracting corporations, operates the pie business. While the consolidating corporations did not liquidate and surrender their charters, they did, under the contract, go out of the pie business, and so it may be said that competition among the consolidating corporations ceased. But so it is with all combinations in a business. It is essential, therefore, that a reasonable construction be given to this language of section 7 of the Corporation act. Section 7 was taken from and is in substance the same as section 7 of the Clayton act, enacted by the United States Congress. Prior to the enactment of this section of the Corporation act an Illinois corporation had no power to acquire or hold stock in another corporation. This section is *in pari materia* with the Anti-trust statute found in the Criminal Code and the two acts are to be construed together.

In support of their contention that the consolidation here violates section 7 of the Corporation act, counsel for plaintiff in error cite *Aluminum Co.* v. *Federal Trade Com.* 284 Fed. 401. That case arose under section 7 of the Clayton act. It was found that a combination whereby a new company was created for stock of which the Aluminum Company subscribed, substantially· lessened competition in the aluminum trade, as it eliminated practically

all competition and gave the Aluminum Company a practical monopoly. The court held that the result was to substantially lessen competition and to tend to create a monopoly. It was also observed that the law was not violated because of substantial lessening of competition between the corporation whose stock was acquired and the one which acquired the stock but because it substantially lessened competition in the aluminum business and tended to create a monopoly in that business. That court observed: "Clearly, the object to which the section is directed is not the mere acquisition of stock of one corporation by another. It is the effect of such acquisition upon commerce." In that case the effect of the combination was not only to end competition between the Aluminum Company and its one competitor in the manufacture and sale of aluminum sheets of wide widths, but it also ended competition between it and one of but two competitors in the manufacture of aluminum sheets of any size, and it was held that the effect of this was inevitably to lessen competition in the trade at large. The test of the application of the Clayton act was held in *International Shoe Co.* v. *Federal Trade Com.* 280 U. S. 291, 74 L. ed. 431, to be not merely the acquisition of one corporation by another, but such acquisition when the stopping or lessening of competition between the contracting corporations injuriously affects the public.

We are of the opinion that the reasonable construction of section 7 of the Corporation act is that the lessening of competition between the corporations involved in the transaction must result in injuriously affecting the public or the trade generally to bring the transaction within the inhibition of that section. To construe the act otherwise would be to prohibit entirely the acquisition of the stock of one corporation by another doing a like business, notwithstanding the provisions of the Corporation act specifically empowering such a transaction when within the limits

prescribed. That this is the correct construction is also evidenced by paragraph 2 of section 66 of the Corporation code, which declares it unlawful for two or more corporations to merge or consolidate where such merger would be "illegally to regulate or control the price of, or illegally to limit the quantity of, or illegally to establish a monopoly in any article." Construing these sections of the Corporation act together, section 7 must be construed to condemn contracts between corporations whereby a combination is effected, the one holding the stock of the other, and resulting in so lessening competition between them as to unduly and unreasonably regulate or control prices or production or stifle competition or create a monopoly in the trade or business in which they were engaged, whereby the public is injuriously affected. We are of the opinion that the consolidation before us did not violate the public policy of this State as expressed in section 7 of the Corporation act.

Plaintiff in error also urges that the agreement to avoid competitive business for a period of ten years in Chicago or within a radius of one hundred miles therefrom, as evidenced by one of the supplemental contracts, is illegal. As pointed out, this restriction is to bind any party to the contract only so long as he is employed by the new corporation and his salary is not substantially reduced. The chancellor found this contract was reasonable, and we are of the opinion that the evidence concerning the sale of pies in the Chicago area is sufficient to sustain that finding. It may be observed, however, that this question is not one which affects the legality of the consolidation.

Counsel for plaintiff in error also argue that certain other sections of the statute pertaining to the method by which such a consolidation shall take place have been violated. Plaintiff in error was one of the contracting parties. Its right to appear here is on the ground that a question of the public interest is involved. Since we hold that there

is no violation of statutes protecting the public interest, plaintiff in error, being *in pari delicto,* is not entitled to be heard on other questions. *Leigh* v. *National Hollow Brake Beam Co.* 224 Ill. 76.

Counsel on both sides have presented in this case able and exhaustive briefs. It has not been possible to note within the confines of this opinion the consideration given to each argument presented.

For the reason herein given we are of the opinion that the circuit court did not err in dismissing the bill for want of equity, and its decree will be affirmed.

*Decree affirmed.*