## UNITED STATES v. REPUBLIC STEEL CORPORATION et al.

### No. 5152.

District Court, N. D. Ohio, E. D.

May 2, 1935.

Russell Hardy, Walter L. Rice, and J. William Fulbright, Sp. Assts. to Atty. Gen., and Emerich B. Freed, U. S. Atty., of Cleveland, Ohio, for the United States.

Frank H. Ginn, Grover Higgins, and W. B. Cockley (of Tolles, Hogsett & Ginn), all of Cleveland, Ohio, and John S. Brookes, Jr., of Washington, D. C., for Republic Steel Corporation.

William P. Belden and George B. Young (of Belden, Young & Veach), both of Cleveland, Ohio, and Livingston Platt, Frank A. Fritz, and Roswell P. C. May (of Platt & Walker), all of New York City, for Corrigan-McKinney Steel Co., Newton Steel Co., and N. & G. Taylor Co.

Sterling Newell and Clan Crawford (of Squire, Sanders & Dempsey), both of Cleveland, Ohio, for McKinney Steel Holding Co.

William P. Belden and George B. Young (of Belden, Young & Veach), both of Cleveland, Ohio, for Cleveland-Cliffs Iron Co.

RAYMOND, District Judge.

This suit was brought February 7, 1935, under sections 7 and 15 of the Clayton Act

(sections 18 and 25, title 15 USCA) to enjoin consummation of a merger agreement entered into August 27, 1934, by officers of Republic Steel Corporation and the Corrigan, McKinney Steel Company, subject to approval of stockholders. The contract is alleged to involve acquisitions of capital stock of defendants engaged in the iron and steel industry by various of the defendants engaged in the same industry, contrary to certain provisions of section 7.

Hearing upon the order to show cause why a temporary injunction should not issue was continued by stipulation until trial of the case on the merits, and it was agreed that in the meantime no steps would be taken to transfer stock or assets under the merger.

The government rests its case solely on that portion of section 7 (15 USCA § 18) which provides that: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition. * * *".

No claim is made that the proofs establish acquisitions of stock in violation of other provisions of the section found in the remainder of the sentence, viz., "* * * or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

For convenience, the defendants will be hereinafter designated as follows: Republic Steel Corporation as Republic; the Corrigan, McKinney Steel Company as Corrigan; the Newton Steel Company as Newton; the N. & G. Taylor Company as Taylor; McKinney Steel Holding Company as Holding Company; and the Cleveland-Cliffs Iron Company as Cleveland-Cliffs.

Republic is a New Jersey corporation, organized in 1930. Its principal office is in Youngstown, Ohio. Republic is the third in size of the steel companies in the United States and produces and sells in interstate commerce large quantities of pig iron, semifinished steel, merchant bars, reinforcing bars and tube rounds, hot and cold rolled sheets, and tin plate. Its principal steel plants are located in Ohio, Pennsylvania, New York, and Illinois. It owns and operates iron mines, coal mines, coke ovens, blast furnaces, and finishing plants, and produces an almost complete line of finished steel products. Its ingot capacity is 5,013,000 gross tons, or about 7.2 per cent. of that of the entire industry. Republic's capital structure consists in round figures of $4,400,000 par amount of preferred stock of subsidiary companies, guaranteed by it; $59,500,000 par amount of its own preferred stock; and 2,000,000 shares of no par common stock. It has assets of approximately $270,000,000 and indebtedness of about $61,000,000. In 1933, its annual sales were $80,000,000 of the total sales for the industry of approximately $1,200,000,000. Its total losses for the years 1930, 1931, 1932, and 1933 were approximately $28,000,000. Republic does not have sufficient raw materials for its needs in the manufacture of pig iron. It is therefore a purchaser of large quantities of iron ore and coal.

Corrigan is an Ohio corporation, organized in 1916, with principal office in Cleveland, Ohio, where it owns and operates its only steel finishing plant. It is twelfth in size of the steel companies in the United States, and produces and sells in interstate commerce large quantities of pig iron, semifinished steel, and merchant bars. It has large reserves of iron ore in Michigan and Minnesota, and of coal in Kentucky. Its most important product is semifinished steel. Its ingot capacity is 1,040,000 gross tons, or about 1.5 per cent. of that of the entire industry. Its capital stock consists of 1,396,445 shares, par value $1 each, of which 1,120,086 are voting and 276,359 are nonvoting. Its principal stockholder is Holding Company. It has assets of approximately $54,000,000. In 1933, its annual sales, including subsidiaries, were $20,800,000. For some years its facilities for producing finished steel have been deficient.

Newton is an Ohio corporation, with its principal office in Youngstown, Ohio. It has cold rolled sheet producing plants at Monroe, Mich., and Newton Falls, Ohio. The latter has been operated for only a brief period since June, 1931. Newton's capital stock consists of 26,065 preferred shares, of which Corrigan owns 20,138, or 77.9 per cent., and 261,550 common shares, of which Corrigan owns 212,389, or 81.20 per cent. Corrigan acquired its stock in Newton in 1932 when Newton was heavily indebted to it for purchases of semifinished

steel. The acquisition was for the purpose of preserving Newton as a customer for semifinished steel. Corrigan has since been compelled to make large advances to Newton to keep it in operation, and as of December 31, 1934, Newton owed Corrigan $1,995,000, secured by pledge of $1,000,000 principal amount of Newton's 7 per cent. bonds and $556,000 face amount of assigned accounts receivable. All of the bonds of such issue, aggregating $4,000,000 in principal amount and which are secured by a mortgage on Newton's entire plant and properties, matured January 1, 1935, and are now in default. Newton has gross assets at book value of $12,434,000. Its current assets on December 31, 1934, amounted to $1,496,000 and its current and overdue liabilities amounted to $5,430,000. In the years 1930 to 1933, Newton's losses were as follows: 1930, $100,000; 1931, $891,000; 1932, $999,000; 1933, $1,027,000.

The mills of both Republic and Newton are what are known in the industry as old-fashioned hand mills; a type being currently superseded by new so-called "continuous" mills, which make sheets in larger volume and at reduced cost. The automobile trade is increasingly demanding wider sheets. Republic cannot make cold rolled sheets wider than 62 inches, whereas nearly 10 per cent. of Newton's cold rolled sheet business in 1933 and more than 20 per cent. in 1934 was in sheets wider than 62 inches. There are in the United States at least ten continuous sheet mills in operation, and at least one other is now under construction. One of these can produce more than 50,000 gross tons of sheets per month.

Taylor is a Maryland corporation, with its principal office in Cumberland, Md. Its only plant consists of a tin plate mill at that place. It has gross assets of $823,000 at book value. Its capital stock consists of 3,000 shares of first preferred stock, of which Corrigan owns 100 per cent.; 2,-911,63 shares of second preferred stock, of which Corrigan owns 878.74 or 30.08 per cent.; and 3,500 shares of no par common stock, all owned by Corrigan. For the fiscal year ending April 30, 1934, Taylor's loss was $159,000. Corrigan's acquisition of Taylor stock occurred in 1929, in connection with the adjustment of a bad debt incurred in the purchase of semifinished steel from Corrigan. Corrigan's investment in Taylor was made for the purpose of preserving Taylor as a customer for semifinished steel. Since the acquisition of Taylor stock, Corrigan has from time to time made advances to Taylor to enable it to carry on business.

Holding Company is a holding corporation organized under the laws of Delaware, with its principal office in Cleveland, Ohio. It owns 48.113 per cent. of the total voting and nonvoting common stock of Corrigan (including 55.02 per cent. of the Corrigan voting common stock and 20.13 per cent. of the Corrigan nonvoting common stock).

Cleveland-Cliffs is an Ohio corporation, with its principal office in Cleveland, Ohio. It owns and operates iron ore mines in Minnesota and Michigan and sells substantial quantities of iron ore, coal, and charcoal pig iron. It owns 7.832 per cent. of the total voting and nonvoting common stock of Corrigan (including 1.31 per cent. of the Corrigan voting common stock and 34.25 per cent. of the Corrigan nonvoting common stock). Cleveland-Cliffs owns all the common shares of Holding Company. Holding Company has outstanding 72,500 shares of 6 per cent. cumulative preferred stock, of which Cleveland-Cliffs owns 38 shares. Dividends on this preferred stock are unpaid, and have accumulated, as of March 31, 1935, to the extent of $18 per share. The preferred stock is retireable by call at the option of the company at $105 per share plus accrued dividends.

By the merger agreement, Corrigan agrees to sell and convey to Republic all of its business, property, assets, and good will, including the controlling stocks of Newton and Taylor now held by Corrigan; to distribute Republic securities received therefor pro rata among its stockholders; to dissolve and go out of business within 30 days after consummation of the purchase agreement, but not earlier than 21 days after the closing date. In consideration thereof, Republic agrees to pay to Corrigan $15,361,000 principal amount of a new issue of bonds to be known as purchase-money first mortgage and collateral trust bonds, secured by first lien on the property purchased, 27,929 shares of a new issue of Republic's prior preference stock, and 698,223 shares of Republic's common stock. Under the agreement Corrigan will distribute pro rata among its stockholders the acquired securities; the holder of each share of Corrigan stock to receive $11 principal amount of Republic bonds, $2 par value of Republic prior preference stock, and one-half share of Republic common

stock. Because of the present proceeding, the contract of August 27, 1934, has not been finally approved by the stockholders of the two companies. However, the holders of more than two-thirds of the stock of each class of each company have signified their approval of the transaction.

Consummation of the merger agreement will result in acquisition of Republic stock by Corrigan as part consideration for its assets; acquisition by Cleveland-Cliffs and Holding Company of Republic stock as their respective distributive shares on the liquidation of Corrigan; and acquisition by Republic of Newton and Taylor stock as part of the assets of Corrigan purchased by Republic. Corrigan receives Republic stock not as owner, but as an intermediary or agent for the benefit of and for distribution to stockholders of Corrigan.

The record discloses that competition now exists between Republic and Corrigan in the sale of pig iron, semifinished steel, and merchant bars. There is also competition between Republic and Newton in the sale of hot and cold rolled sheets, and between Republic and Taylor in the sale of tin plate and black plate.

Ingot capacities of the leading steel companies of the United States and the percentage of these capacities to the entire industry is shown by Exhibit T, as follows:

commodities produced by the merging companies.

The record is voluminous, but in the view which the court takes of the issues involved the foregoing statement is adequate. The fundamental and controlling differences relate to the proper construction of the provisions of section 7 (15 USCA § 18) relied upon by the government, and to the deductions and inferences which may be fairly drawn from the evidence.

It is the claim of the government that substantial competition now exists among the several corporations whose stock would be acquired and the corporations making the acquisitions, and that the effect of these stock acquisitions may be to substantially lessen competition within the meaning of that portion of the Clayton Act here invoked. As indicated, the government predicates its suit solely upon the first of the three standards of effect of stock acquisitions which are within the condemnation of the section, and insists that to be entitled to the relief sought it is necessary to show merely that the effect may be to substantially lessen competition between the corporations acquiring the stock and the corporations whose stock is acquired. It contends that if there is shown to now exist any substantial competition between Republic and Corrigan or others of the defendants, and that that competition would

| | Name of Company | Ingot Capacity | | Percentage to Industry |
|---|---|---|---|---|
| 1. | United States Steel Corp. | 27,342,000 | Gross Tons | 39.2% |
| 2. | Bethlehem Steel Corp. | 9,360,000 | Gross Tons | 13.4% |
| 3. | Republic Steel Corp. | 5,013,000 | Gross Tons | 7.2% |
| 4. | Jones and Laughlin Steel Corp. | 3,671,000 | Gross Tons | 5.3% |
| 5. | Youngstown Sheet & Tube Co. | 3,120,000 | Gross Tons | 4.5% |
| 6. | American Rolling Mill Co. | 2,233,000 | Gross Tons | 3.2% |
| 7. | National Steel Corp. | 2,120,000 | Gross Tons | 3.0% |
| 8. | Inland Steel Co. | 2,006,000 | Gross Tons | 2.9% |
| 9. | Wheeling Steel Corp. | 1,500,000 | Gross Tons | 2.1% |
| 10. | All other Steel Companies | 13,381,000 | Gross Tons | 19.2% |
| | | 69,746,000 | | 100% . |

Completion of the merger will not affect the relative position of the Republic Steel Corporation in the industry. The proposed merger appears to be warranted by sound economic considerations, and the number and size of competing units as shown by Exhibit T disclose that the rival competing units outside the merger are of sufficient strength and activity to insure continuance of vigorous competitive conditions as to all

be eliminated or substantially lessened as the result of the stock acquisition, the merger is prohibited by section 7 (15 USCA § 18). In short, it contends that because Corrigan contracts to dissolve within 30 days (thereby entirely eliminating it from the field of competition), the sole proper inquiry in this case is whether or not there now exists substantial competition between the corporations proposing to

merge. It argues that by the clause relied upon, construed in the light of the authorities, Congress has in effect declared that substantial lessening of competition and public injury are synonymous, and urges that Congress did not intend to submit tne general question of public injury to the courts.

On the other hand, defendants insist that section 7 does not forbid mere acquisitions of assets, and that therefore the acquisition for distribution to its shareholders by Corrigan of Republic stock, and the acquisitions by Republic of Newton and Taylor stock, being incidental to a transaction whereby assets are acquired, are exempt from its provisions. They also urge, upon the authority of International Shoe Company v. Federal Trade Commission, 280 U. S. 291, 50 S. Ct. 89, 74 L. Ed. 431, that the Clayton Act does not forbid mere acquisition by one corporation of stock of a competitor even though it results in some lessening of competition; that the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree; and that this means to such a degree as will injuriously affect the public. Defendants rely principally upon the following cases to sustain their contentions: International Shoe Co. v. Federal Trade Commission, supra; Temple Anthracite Coal Co. v. Federal Trade Commission (C. C. A.) 51 F.(2d) 656; V. Vivaudou, Inc., v. Federal Trade Commission (C. C. A.) 54 F.(2d) 273; Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission (C. C. A.) 65 F.(2d) 336; and Moody & Waters Co. v. Case-Moody Corp., 354 Ill. 82, 187 N. E. 813.

The case turns upon the question of which of these conflicting views is correct. The undisputed facts and proper deductions therefrom entitle petitioner to the relief sought if the statutory provisions are to be construed as narrowly as contended by the government, and, as clearly, deny the right to remedial relief if the statute should be construed in conformity with defendants' contentions.

No authority is found whereby it is decided that that portion of section 7 relied upon by petitioner is applicable to contracts of merger regardless of the element of public interest. Cases involving other sections of the act lead to the conclusion that it is an important, if not the controlling, element. In the case of Standard Oil Co.

v. Federal Trade Commission (C. C. A.) 282 F. 81, 86 (1922) (a proceeding under section 3 [15 USCA § 14]), Judge Woolley stated the underlying principles of the Clayton Act in the following terms: "To make clear the principle upon which we shall examine the testimony and decide these cases, it may be well to observe that the Clayton Act, which is a part of the scheme of laws against unlawful restraints and monopolies, does not wait for its operation until monopolies have been created and restraints of trade established, but seeks to reach them in their incipiency and stop their growth. Yet, in thus avoiding an objectionable effect by removing the cause, the Congress did not intend the statute to reach every remote lessening of competition or every dim and uncertain tendency to monopoly. It intended rather that the Commission, and ultimately the courts, should inquire not whether a given practice may possibly lessen competition or possibly create a monopoly, but whether it probably lessens competition—and lessens it substantially—and whether it actually tends to create a monopoly. Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653. Though differing somewhat from other laws, as we have indicated, the Clayton Act, nevertheless, deals with matters within the realm of monopoly. Therefore in determining whether given acts amount to unfair methods of competition within the meaning of the Federal Trade Commission Act, or substantially lessen competition and tend to create a monopoly within the meaning of the Clayton Act, the only standard of legality with which we are acquainted is the standard established by the Sherman Act [15 USCA §§ 1-7, 15 note] in the words 'restraint of trade or commerce' and 'monopolize, or attempt to monopolize,' and by the courts in construing the Sherman Act with reference to acts 'which operate to the prejudice of the public interest by unduly restricting competition or unduly obstructing the due course of trade,' and 'restrict the common liberty to engage therein.' "

In the case of Federal Trade Commission v. Sinclair Refining Co., 261 U. S. 463, 476, 43 S. Ct. 450, 454, 67 L. Ed. 746 (1923) (also a proceeding under section 3 [15 USCA § 14]), in referring to the general purposes of the Sherman Anti-Trust Act (15 USCA §§ 1-7, 15 note) and the Clayton Act (38 Stat. 730) it was said:

"The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain. And to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs."

In the case of V. Vivaudou, Inc., v. Federal Trade Commission (C. C. A.) 54 F.(2d) 273, 275 (1931), the test of "prejudice of the public interest" was applied in a proceeding under section 7 of the Clayton Act (15 USCA § 18). After referring with approval to the Sinclair Case, supra, and the Standard Oil Case, supra, Judge Manton said: "Unless there be a monopoly or tendency toward monopoly, we would not be warranted in concluding that the public had an interest as referred to in the statute."

The same doctrine was recognized and applied by the Circuit Court of Appeals of the Third Circuit in the case of Temple Anthracite Coal Co. v. Federal Trade Commission, 51 F.(2d) 656 (1931) (a proceeding under section 7 of the Clayton Act [15 USCA § 18]).

In the case of Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission, 65 F.(2d) 336 (1933), the Circuit Court of Appeals 'of the Second Circuit applied the same test in a proceeding under section 7 of the Clayton Act (15 USCA § 18), but found that the public interest was affected by the transaction. The holding in this case was reversed in Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission, 291 U. S. 587, 54 S. Ct. 532, 78 L. Ed. 1007 (1934), but upon other grounds.

In the case of Moody & Waters Co. v. Case-Moody Corporation, 354 Ill. 82, 96, 187 N. E. 813, 819 (1933), it was said with reference to section 7 of the Illinois Corporation Act, Smith-Hurd Rev. St. 1931, c. 32, § 7 (modeled after section 7 of the Clayton Act [15 USCA § 18]): "We are of the opinion that the reasonable construction of section 7 of the Corporation Act is that the lessening of competition between the corporations involved in the transaction must result in injuriously affecting the public or the trade generally to bring the transaction within the inhibition of that section. To construe the act otherwise would be to prohibit entirely the acquisition of the stock of one corporation by another doing a like business, notwithstanding the provisions of the Corporation Act specifically empowering such a transaction when within the limits prescribed. That this is the correct construction is also evidenced by paragraph 2 of section 66 of the Corporation Act (Smith-Hurd Rev. St. 1931, c. 32, § 66, par. 2) which declares it unlawful for two or more corporations to merge or consolidate where such merger would be 'illegally to regulate or control the price of, or illegally to limit the quantity of, or illegally to establish a monopoly in any article.' Construing these sections of the Corporation Act together, section 7 must be construed to condemn contracts between corporations whereby a combination is effected, the one holding the stock of the other, and resulting in so lessening competition between them as to unduly and unreasonably regulate or control prices or production or stifle competition or create a monopoly in the trade or business in which they were engaged, whereby the public is injuriously affected. We are of the opinion that the consolidation before us did not violate the public policy of this state, as expressed in section 7 of the Corporation Act."

Each of the foregoing cases which was decided subsequent to 1930 recognized and applied the test as prescribed by the Supreme Court in the case of International Shoe Company v. Federal Trade Commission, 280 U. S. 291, 298, 50 S. Ct. 89, 91, 74 L. Ed. 431 (1930), as follows: "Mere acquisition by one corporation of the stock of a competitor, even though it result in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree, Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 357, 42 S. Ct. 360, 66 L. Ed. 653; that is to say, to such a degree as will injuriously affect the public."

In the judgment of the court, the case of Standard Fashion Co. v. Magrane-Houston Co., supra (1921), which was a proceeding under section 3 of the Clayton Act (15 USCA § 14), furnishes no support for the contention of petitioner in this case. In that case, both the Circuit Court of Appeals (259 F. 793) and the District Court (254 F. 493) had found that the contract under consideration was within the prohibitions of the Clayton Act as one which substantially lessened competition and tended to create a monopoly.

■ Careful analysis of the foregoing and of other cases brings conviction that the courts have been unwilling to adopt a construction of the language used in section 7 which warrants an injunction against acquisition of stock in another corporation by one engaged in interstate commerce without affirmative showing of a probable effect to restrain commerce, create a monopoly, or other injurious effect upon public interest. When a statute has been construed by the highest courts having jurisdiction to pass on it, such construction is as much a part of the statute as if plainly written into it originally. See Douglass v. County of Pike, 101 U. S. 677, 25 L. Ed. 968.

But even if the interpretation of the language of section 7 were before the court without such authoritative construction, the result would not be different. The essential difference between lawful and unlawful acquisition of stock under the first sentence of section 7 lies in the effect of the transaction. The mere acquisition by one corporation of stock of another is not prohibited. The mere size of an organization, or the fact alone that a number of organizations have combined for the purpose of bettering the condition of the industry where the effect will probably not be to substantially lessen competition between the corporation whose stock is acquired and the corporation making the acquisition, is not condemned. The use of the word "substantial" implies a basis for comparison. The idea expressed varies greatly with the context and environment in which it is found. It may import negation of things merely illusive, seeming, or imaginary, or, on the other hand, may exclude only that which does not fundamentally and materially influence a result. Justice Holmes in the case of Towne v. Eisner, 245 U. S. 418, 425, 38 S. Ct. 158, 159, 62 L. Ed. 372, L. R. A. 1918D, 254, said: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

The use of the word in this statute was not casual. It was inserted only after much debate and deliberation. Objections by members of Congress to its inclusion in section 7 of the Clayton Act (15 USCA § 18) upon the ground that it would permit courts to interpolate into the section qualifications similar to those ultimately adopted in the construction of the Sherman Anti-Trust Act were without avail. See 51 Cong. Rec. 15,856–7, 16,047. The difference between "lessening competition" and "substantially lessening competition" was the subject of earnest debate on the floor of the Senate. One objector said: "The Supreme Court said that the restraint of trade must be 'unreasonable.' We say it must be 'substantial.' Unless the word 'substantial' means as much as the word 'unreasonable', it means nothing. In my opinion the word is of broader significance and the injury done to our trust legislation by its interpolation is greater than was accomplished by the Supreme Court when it manufactured and imported into the statutes of Congress the term 'unreasonable.'"

It was then clearly recognized that inclusion of the word would, in cases brought under the act, necessitate evidence of things difficult to prove. It was known that the Sherman Act had been finally construed in 1911 by the Supreme Court in the cases of Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663, as prohibiting only such contracts and combinations as amount to unreasonable or undue restraint of trade. Thenceforth, the test applied in cases under that act was whether the public is or may be injured by excessive prices, or whether competitors large or small are or may be injured by unfair practices. In the International Shoe Company Case, supra, the Supreme Court approved the same test in cases arising under section 7 of the Clayton Act (15 USCA § 18). When the legislative history of the act is considered, the conclusion reached seems beyond escape.

However inadequate or outmoded they may seem to be in the stress of the present economic situation, we must not overlook the fact that the dominating purpose of our anti-trust laws is to avoid undue concentration of commercial power; to preserve the principle of free, fair, and open competition; to keep the door of opportunity open to small business; and to protect the consumer so that he can purchase his commodities at competitive prices. No purpose to forbid all mergers appears.

■ Courts may take cognizance of the fact that the agencies of the government charged with enforcement of the Clayton

law have during the twenty years since it became effective apparently applied no different construction. Official and semiofficial reports reflect that which is likewise a matter of common knowledge, viz., that during the time the Clayton Act has been in force combinations, mergers, and consolidations have been consummated to a far greater extent than ever before, and frequently in the manner contemplated by the agreement here under consideration.

The act was interpreted by the Federal Trade Commission not long after its enactment to permit the purchase of the physical assets of a competitor by a manufacturer engaged in interstate commerce. 1 Federal Trade Commission Decisions, 541. This administrative construction was given weight by the Attorney General in 1922 in considering the legality of the merger of various steel companies, including the Bethlehem Steel Corporation, under a plan whereby property of the Lackawanna Steel Company was to be conveyed by the latter company to the former in return for shares of stock to be distributed among shareholders. 33 Op. Atty. Gen. 225, 241. These interpretations and the trend toward mergers are in no sense controlling. The results, however, are not without importance in considering probability, of injurious effects. It is certain that the anti-trust laws have failed to restrict the merger movement. Concentration of industry is no longer a future consideration as it was largely in 1890 when the Sherman Anti-Trust Act became a law and to a considerable extent in 1914 when the Clayton Act was made effective. It has become an accomplished fact. The result of combinations and mergers may be and not uncommonly is to save overhead, increase mass production, reduce prices, and improve the product. Where these beneficial results are used fairly and are passed on to the consuming public and to employees, it cannot be considered that, when construed in the light of the International Shoe Case, they are within the prohibitions of section 7. The elimination in such cases of the competition between the merging corporations is, in reality, a step in the strengthening of competition between the units vitalized thereby and the general industry. Therefore, instead of probability of injury to the public resulting from consummation of such merger, the interest of the public will be enhanced.

The foregoing observations warrant the conclusion that in proceedings under those provisions of section 7 of the Clayton Act (15 USCA § 18) here relied on, the burden rests on petitioner to prove that the effect of the stock acquisitions will probably be injurious to the public, and that it is not sufficient merely to show lessening of competition. This conclusion results from the consideration of the fundamental purposes of the statute, its construction by the courts, its contemporaneous interpretation by the agencies charged with its enforcement, and its legislative history importing weight to the inclusion of the word "substantial." It also gives weight to the competitive situation existing in the industry, as well as to changing economic conditions, and recognizes that determination of the issue of injury to the public may vary with these elements.

The record is devoid of proof that consummation of the merger contract would be in any sense inimical to the interests of the public. While the evidence justifies the conclusion that competition is to some degree eliminated as to certain products, that competition may with propriety be designated as de minimis when compared with the competition in the industry as a whole, and as being insufficient to affect the public interest when considered in its relation to the total sales in the competitive areas included within the several states where the business of the merging companies is chiefly conducted. There is no evidence that the contemplated merger was entered upon with the purpose of lessening competition or of exercising control over competitive conditions in the steel industry. The practical impossibility of that accomplishment is so definitely disclosed that no such aim can fairly be implied. Attempted control of competition in an industry where overproduction has for several years been clearly apparent and in which intense competition has eliminated many of the weaker units to the extent that two now control over 52 per cent. of the capacity of the industry and nine control over 80 per cent. thereof would be futile. The capacity of the industry to produce is greatly in excess of present or even normal demands in every important iron and steel product. In the year 1929, the industry operated at only 89 per cent. of capacity, and since that time has at no time operated in excess of 40 per cent. of

capacity. Competition in the steel industry generally will be enhanced rather than lessened as the result of the merger.

There is nothing from which it may be found that the purpose of the merger is to increase the price of any iron or steel product, to create a monopoly, to achieve a mere increase in size, or to ultimately bring about further mergers. The apparent purpose on the part of Republic is to acquire additional and needed supplies of iron ore and coal and additional facilities supplementing its own, for the manufacture of pig iron and semifinished steel, and to bring about a reduction in costs in manufacture and distribution. Corrigan's purpose is to unite its stockholders with a corporation having an excess of finishing facilities, thereby obviating necessity for further capital expenditures in construction or acquisition of finishing plants. The net result will be better balanced facilities making possible manufacture at lowered costs.

Denial of the relief prayed is compelled by petitioner's failure to prove sufficiently substantial lessening of competition to warrant a finding of probable injury to the public as a result of consummation of the merger. The evidence drawn from the wording of the statute, combined with the judicial, administrative, and practical interpretation thereof, necessitates the result reached in this case.

The foregoing opinion is adopted by the court as its findings of fact and conclusions of law, and is hereby made a part of the record.

A decree of dismissal, in conformity with the foregoing opinion, may be submitted for signature.