### AMERICAN PRESS ASS'N et al. v. UNITED STATES et al.

(Circuit Court of Appeals, Seventh Circuit. August 25, 1917.)

#### Nos. 2509, 2510.

MONOPOLIES ⊝12(1)—SELLING LOSING BUSINESS—SHERMAN LAW.

    A concern which is going out of business, because it cannot conduct it without loss, may without violation of the Sherman Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209) sell its plant as a going concern to its only competitor, there being no other prospective purchaser, instead of disposing of it as junk; this not injuring the public, but being to its advantage, as well as that of the seller; the buyer being required to continue fair dealing with the public.

Appeals from the District Court of the United States for the Northern District of Illinois.

Suit by the United States against the American Press Association and others. From decrees dismissing the petition and auxiliary bill of the American Press Association, certain parties appeal. Reversed in part, with direction, and in part dismissed.

Charles E. Hughes, of New York City, for appellants.

Henry S. Mitchell, of Washington, D. C., for appellees.

Before BAKER and ALSCHULER, Circuit Judges, and HUMPHREY, District Judge.

BAKER, Circuit Judge. On August 3, 1912, the United States began a suit against the American Press Association, a corporation, the Western Newspaper Union, a corporation, and others, engaged in furnishing country newspapers with stereotype plates and ready-print service, to enjoin the continuance of acts alleged to be in viola-

tion of the Sherman Anti-Trust Law. A consent decree was entered the same day. Among other prohibitions, the Western Newspaper Union was permanently enjoined:

"(a) From combining or attempting to combine with the American Press Association, either by purchase, stock ownership, or in any other manner; * * * (c) from selling any of its product or services at less than a fair and reasonable profit, or at cost, or less than cost, with the pupose or intent of injuring or destroying the interstate trade and commerce of the American Press Association or of any other competitors."

On May 9, 1917, the American Press Association filed a petition in the original suit, setting forth changes in condition, on account of which it prayed for a modification of provision (a). To this petition all the parties appeared, evidence was heard, and the court found:

"That the facts set forth in the petition and the evidence introduced to support the same are immaterial; that it is contrary to the whole spirit and purpose of the Sherman Law to authorize one competitor to absorb another competitor, regardless of whether such competitor is able to continue in business or not; and that the sale of such assets and business by the American Press Association to the Western Newspaper Union would be in violation of the Sherman Law."

And thereupon the court decreed that the petition be denied. Cause No. 2509 is an appeal from that decree.

Shortly after presenting the above-mentioned petition, the American Press Association filed an "auxiliary bill," setting forth the same facts and asking the same relief. Parties other than the United States appeared and answered; and the United States filed a motion to dismiss, on the ground that it could not be sued by a private party without its consent. Without passing on the motion, the court dismissed the bill, for the same reasons on which the petition was denied. Cause No. 2510 is an appeal from the decree dismissing the auxiliary bill.

Whether under the stated circumstances the United States may be sued, and whether the auxiliary bill was a proper method of invoking relief, are questions that are now moot, we believe, because the identical controversy respecting facts and law, between the identical parties, was fully heard and determined on the petition in the original suit.

Facts pleaded and proved, so far as necessary for a decision, are briefly these: In 1912 the American Press Association had about 5 per cent. of the ready-print business. But it did not furnish advertisements to the country newspapers with its ready-print service, whereas the Western Newspaper Union did. The result, down to January, 1917, was that the Western Newspaper Union could and did supply ready-print at lower rates than the American Press Association could stand without loss; and the ready-print business of the latter has fallen to less than 1 per cent. In 1912 the American Press Association had a large part of the stereotype plate business. But its plate business had to bear substantially all the overhead expenses, while the Western Newspaper Union's ready-print service could carry the overhead and leave its plate business as a profitable by-product. In January, 1917, the Western Newspaper Union reduced its price on miscellaneous plate matter by one-fourth and on serials by one-third. On the American Press Association's complaint that provision (c) of

the injunction was being violated, the Department of Justice investigated and correctly found that there was no violation.

Since the outbreak of the world war there has been an increasing scarcity of print paper, and mounting prices. Few new country newspapers are being started; many have reduced their sizes; quite a number have quit. This condition brought the American Press Association's plate business to a loss of over $3,000 a month, which is progressively increasing, and has also made it impossible for that company to build a ready-print business to help bear the overhead. The directors have decided to wind up the plate business as speedily as possible, whatever may be the outcome of this proceeding. They are continuing it at a loss while the question is being determined whether they must dispose of their plate plant as junk, or whether they may sell it as a going concern to the Western Newspaper Union, for the latter is the only probable bidder. No one now outside the business would be likely to buy a demonstrated loss. But to the Western Newspaper Union the plant may have more than junk value. If the plant is broken up, the newspapers now being served thereby may have to go to the Western Newspaper Union as the only concern left in the business; and it might be more economical for that company to buy an existing plant than to enlarge its own or build a new one. At the same time it is evident that, if the plant is disintegrated, the newspapers now looking to it would suffer inconvenience and loss while arranging to obtain other service.

What is the application of the Sherman Law to these facts? Not every joinder of competing businesses or acquisition of instrumentalities that have been used in competition is an undue restraint of trade or a creation of a monopoly. Each situation must be measured by the rule of reason. And a fundamental test is injury to the public. If it were not for provision (a) of the decree, and the law back of it, these two companies might get together and fix a price that would provide a reasonable profit to the American company and an unreasonable one to the Western. For the newspapers, and through them the public, to pay for the profitable operation of an inefficient concern is an injury. And a combination to that end would be an unreasonable restraint of trade. That course cannot be pursued. And, because it cannot, the American company is forced to go out of the plate business. No decree can stop that. And after the American company quits, if the Western is left alone in the field, the ultimate situation of the country newspapers would be the same whether the plant be scrapped or sold as an integer. Neither the decree nor, in our judgment, the Sherman Law, prevents the Western from buying the scraps piecemeal. If it did buy, it could organize them anew. If it be permitted to buy the integer, it would save the expense of reorganization. If the plant be scrapped, two injuries result: One to the public from the destruction of a usable and useful plant; the other to the stockholders of the American company.

As to the first, a law designed to shield the public from injury should not be construed to compel the public to suffer an injury. As to the second, the Sherman Law, in our opinion, does not require the stock-

holders of a company, even a company that was a self-confessed wrongdoer in 1912, to sustain a loss in 1917 arising without wrongdoing, if that loss can be prevented without injury to the public. Injury can be prevented, we believe, by attaching to the permission to buy the plant as a going concern a condition which should be read in the light of provision (c) of the injunction. Within common knowledge one of the evils at which the Sherman Law was aimed was the acts of monopolizers in killing competitors, by selling at less than cost of production and then mulcting the public for the expense of the campaign with undue profits added. For practices of that kind during and prior to 1912 the Western Newspaper Union was put under the continuing prohibition of provision (c). Since 1912 it has not charged less than cost plus a fair and reasonable profit. On the other hand, the record, at least inferentially, demonstrates that it has not exacted more than cost plus a fair and reasonable profit. If it continues in the same even tenor of fairness, if it refrains from putting up prices that would incite outside capital to unneeded offers of like service and then killing competition by underselling at a loss, to be recouped by fixing unwarranted prices again, we perceive no reason why it should not be permitted to buy the plant as a going concern.

In No. 2509 the decree denying the petition is reversed, with direction to enter a decree, supplemental to the original decree, authorizing the Western Newspaper Union to be a bidder and purchaser at a sale by the American Press Association of its plate plant and business as a going concern, on the condition and under the prohibition that the Western Newspaper Union shall not employ the plant and business so purchased, or use the situation created by such purchase, to charge more for its plate service to newspaper publishers than cost of production plus a fair and reasonable profit, such fair and reasonable profit to be measured relatively by the range of annual profit obtained by the Western Newspaper Union from its plate business since the entry of the original decree of August 3, 1912, without, however, depriving the purchaser of such profits as result from its purchase by reason of the increase of business and the economies in the cost of production following the same; provided that present prices for plate service to newspaper publishers shall not be increased, unless, but not longer than, an increase is warranted by increase in cost factors.

In No. 2510, the appeal is dismissed, without taxation of costs, in favor of appellees.