## INTERNATIONAL SHOE COMPANY *v.* FEDERAI TRADE COMMISSION.

No. 42. Argued December 2, 3, 1929.—Decided January 6, 1930.

*Mr. Charles Nagel,* with whom *Messrs. Frank Y. Gladney, R. E. Blake,* and *J. D. Williamson* were on the brief, for petitioner.

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Hughes* and *Messrs. Charles H. Weston,* Special Assistant to the Attorney General, *Robert E. Healy,* Chief Counsel, Federal Trade Commission, and *Baldwin B. Bane,* Special Attorney, were on the brief, for respondent.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This was a proceeding instituted by complaint of the Federal Trade Commission against petitioner charging a violation of § 7 of the Clayton Act, c. 323, 38 Stat. 730, 731 (U. S. C., Title 15, § 18), which provides:

" No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

\* \* \* \* \*

" This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."

The complaint charges that in May 1921, while petitioner and the W. H. McElwain Company were engaged in commerce in competition with each other, petitioner acquired all, or substantially all, of the capital stock of the McElwain Company and still owns and controls the

same; that the effect of such acquisition was to substantially lessen competition between the two companies; to restrain commerce in the shoe business in the localities where both were engaged in business in interstate commerce; and to tend to create a monopoly in interstate commerce in such business. The last named charge has not been pressed and may be put aside. Upon a hearing before the commission evidence was introduced from which the commission found, (a) that the capital stock of the McElwain Company had been acquired by the petitioner at the time charged in the complaint, (b) that the two companies were at the time in substantial competition with one another, and (c) that the effect of the acquisition was to substantially lessen competition between them and to restrain commerce. Thereupon the commission put down an order directing petitioner to divest itself of all capital stock of the McElwain Company then held or owned, directly or indirectly, by petitioner, and to cease and desist from the ownership, operation, management and control of all assets acquired from the McElwain Company subsequent to the acquisition of the capital stock, etc., and to divest itself of all such assets, etc. Upon appeal by petitioner to the court below the order of the commission was affirmed. 29 Fed. (2d) 518.

The principal grounds upon which the order here is assailed are (1) that there never was substantial competition between the two corporations, and, therefore, no foundation for the charge of substantial lessening of competition; (2) that at the time of the acquisition the financial condition of the McElwain Company was such as to necessitate liquidation or sale, and, therefore, the prospect for future competition or restraint was entirely eliminated. Since, in our opinion, these grounds are determinative, we find it unnecessary to consider the challenge to the sufficiency of the complaint and other contentions.

*First.* Prior to the acquisition of the capital stock in question the International Shoe Company was engaged in manufacturing leather shoes of various kinds. It had a large number of tanneries and factories and sales houses located in several states. Its business was extensive, and its products were shipped and sold to purchasers practically throughout the United States. The McElwain Company, a Massachusetts corporation with its principal office in Boston, also manufactured shoes and sold and distributed them in several states of the Union. Principally, it made and sold dress shoes for men and boys. The International made and sold a line of men's dress shoes of various styles, which, although comparable in price, and to some degree in quality, with the men's dress shoes produced by the McElwain Company, differed from them in important particulars. Such competition as there was between the two companies related alone to men's dress shoes.

The findings of the commission that this competition between the two companies was substantial and, by the acquisition of the stock of the McElwain Company, had been substantially lessened, the Court of Appeals affirmed, holding that they were fully supported by the evidence. Upon a careful review of the record we think the evidence requires a contrary conclusion.

It is true that both companies were engaged in selling dress shoes to customers for resale within the limits of several of the same states; but the markets reached by the two companies within these states, with slight exceptions hereafter mentioned, were not the same. Certain substitutes for leather were used to some extent in the making of the McElwain dress shoes; and they were better finished, more attractive and modern in appearance, and appealed especially to city trade. The dress shoes of the International were made wholly of leather and were of a better wearing quality; but among the

retailers who catered to city or fashionable wear, the McElwain shoes were preferred. The trade policies of the two companies so differed that the McElwain Company generally secured the trade of wholesalers and large retailers; while the International obtained the trade of dealers in the small communities. When requested, the McElwain Company stamped the name of the customer (that is the dealer) upon the shoes, which the International refused to do; and this operated to aid the former company to get, as generally it did get, the trade of the retailers in the larger cities. As an important result of the foregoing circumstances, witnesses estimated that about 95 per cent. of the McElwain sales were in towns and cities having a population of 10,000 or over; while about 95 per cent. of the sales of the International were in towns having a population of 6,000 or less. The bulk of the trade of each company was in different sections of the country, that of the McElwain Company being north of the Ohio River and east of the State of Illinois, while that of the International was in the south and west. An analysis of the sales of the International for the twelve months preceding the acquisition of the McElwain capital stock, discloses that in 42 states no men's dress shoes were sold to customers of the McElwain Company; and that in the remaining six states during the same period a total of only 52-5/12 dozen pairs of such shoes had been sold to sixteen retailers and three wholesalers who were also customers of the McElwain Company. This amounted to less than one-fourth of the production of dress shoes by the International for a single day, the daily production being about 250 dozen pairs.

It is plain from the foregoing that the product of the two companies here in question, because of the difference in appearance and workmanship, appealed to the tastes of entirely different classes of consumers; that while a

portion of the product of both companies went into the same states, in the main the product of each was in fact sold to a different class of dealers and found its way into distinctly separate markets. Thus it appears that in respect of 95 per cent. of the business there was no competition in fact and no contest, or observed tendency to contest, in the market for the same purchasers; and it is manifest that, when this is eliminated, what remains is of such slight consequence as to deprive the finding that there was substantial competition between the two corporations, of any real support in the evidence. The rule to be followed is stated in *Federal Trade Comm'n* v. *Curtis Co.*, 260 U. S. 568, 580:

" Manifestly, the court must inquire whether the Commission's findings of fact are supported by evidence. If so supported, they are conclusive. But as the statute grants jurisdiction to make and enter, upon the pleadings, testimony and proceedings, a decree affirming, modifying or setting aside an order, the court must also have power to examine the whole record and ascertain for itself the issues presented and whether there are material facts not reported by the Commission. If there be substantial evidence relating to such facts from which different conclusions reasonably may be drawn, the matter may be and ordinarily, we think, should be remanded to the Commission—the primary fact-finding body—with direction to make additional findings, but if from all the circumstances it clearly appears that in the interest of justice the controversy should be decided without further delay the court has full power under the statute so to do. The language of the statute is broad and confers power of review not found in the Interstate Commerce Act."

Section 7 of the Clayton Act, as its terms and the nature of the remedy prescribed plainly suggest, was intended for the protection of the public against the evils

which were supposed to flow from the undue lessening of competition. In *Standard Oil Co.* v. *Federal Trade Commission,* 282 Fed. 81, 87, the Court of Appeals for the Third Circuit applied the test to the Clayton Act which had theretofore been held applicable to the Sherman Act, namely, that the standard of legality was the absence or presence of prejudice to the public interest by unduly restricting competition or unduly obstructing the due course of trade. In *Federal Trade Comm'n* v. *Sinclair Co.,* 261 U. S. 463, 476, referring to the Clayton Act and the Federal Trade Commission Act, this Court said:

" The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain."

Mere acquisition by one corporation of the stock of a competitor, even though it result in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree, *Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U. S. 346, 357; that is to say, to such a degree as will injuriously affect the public. Obviously, such acquisition will not produce the forbidden result if there be no pre-existing substantial competition to be affected; for the public interest is not concerned in the lessening of competition, which, to begin with, is itself without real substance. To hold that the 95 per cent. of the McElwain product, sold in the large centers of population to meet a distinct demand for that particular product, was sold in competition with the 95 per cent. of the International product, sold in the rural sections and the small towns to meet a wholly different demand, is to apply the word " competition " in a highly deceptive sense. And if it be conceded that the entire remaining five per cent. of each company's product (although clearly it was materially less than that) was sold

in competitive markets, it is hard to see in this, competition of such substance as to fall within the serious purposes of the Clayton Act. Compare *Industrial Ass'n v. United States*, 268 U. S. 64, 84.

In addition to the circumstances already cited, the officers of the International testified categorically that there was in fact no substantial competition between the companies in respect of these shoes, but that at most competition was incidental and so imperceptible that it could not be located. The existence of competition is a fact disclosed by observation rather than by the processes of logic; and when these officers, skilled in the business which they have carried on, assert that there was no real competition in respect of the particular product, their testimony is to be weighed like that in respect of other matters of fact. And since there is no testimony to the contrary and no reason appears for doubting the accuracy of observation or credibility of the witnesses, their statements should be accepted.

It follows that the conclusion of the commission and the court below to the effect that the acquisition of the capital stock in question would probably result in a substantial lessening of competition must fail for lack of a necessary basis upon which to rest.

*Second.* Beginning in 1920 there was a marked falling off in prices and sales of shoes, as there was in other commodities; and, because of excessive commitments which the McElwain Company had made for the purchase of hides as well as the possession of large stocks of shoes and an inability to meet its indebtedness for large sums of borrowed money, the financial condition of the company became such that its officers, after long and careful consideration of the situation, concluded that the company was faced with financial ruin, and that the only alternatives presented were liquidation through a receiver or an outright sale. New orders were not coming in; losses

during 1920 amounted to over $6,000,000; a surplus in May, 1920, of about $4,000,000 not only was exhausted, but within a year had been turned into a deficit of $4,-382,136.70. In the spring of 1921 the company owed approximately $15,000,000 to some 60 or 70 banks and trust companies, and, in addition, nearly $2,000,000 on current account. Its factories, which had a capacity of 38,000 to 40,000 pairs of shoes per day, in 1921 were producing only 6,000 or 7,000 pairs. An examination of its balance sheets and statements and the testimony of its officers and others conversant with the situation, clearly shows that the company had reached the point where it could no longer pay its debts as they became due. In the face of these adverse circumstances it became necessary, under the laws of Massachusetts, to make up its annual financial statement, which, when filed, would disclose a condition of insolvency, as that term is defined by the statute and decisions of the State, General Laws 1921, c. 106, § 65 (3); *Holbrook* v. *International Trust Co.,* 220 Mass. 150, 155; *Steele* v. *Commissioner of Banks,* 240 Mass. 394, 397, and thus bring the company to the point of involuntary liquidation. In this situation, dividends on second preferred and common stock were discontinued, and the first preferred stockholders were notified that the company was confronted with the necessity of discontinuing dividends on that class of stock as well.

The condition of the International Company, on the contrary, notwithstanding these adverse conditions in the shoe trade generally, was excellent. That company had so conducted its affairs that its surplus stock was not excessive, and it was able to reduce prices. Instead of a decrease, it had an increase of business of about 25 per cent. in the number of shoes made and sold. During the early months of 1921, orders exceeded the ability of the company to produce, so that approximately one-third of

them were necessarily canceled. In this situation, with demands for its products so much in excess of its ability to fill them, the International was approached by officers of the McElwain Company with a view to a sale of its property. After some negotiation, the purchase was agreed upon. The transaction took the form of a sale of the stock instead of the assets, not, as the evidence clearly establishes, because of any desire or intention to thereby affect competition, but because by that means the personnel and organization of the McElwain factories could be retained, which, for reasons that seem satisfactory, was regarded as vitally important. It is perfectly plain from all the evidence that the controlling purpose of the International in making the purchase in question was to secure additional factories, which it could not itself build with sufficient speed to meet the pressing requirements of its business.

Shortly stated, the evidence establishes the case of a corporation in failing circumstances, the recovery of which to a normal condition was, to say the least, in gravest doubt, selling its capital to the only available purchaser in order to avoid what its officers fairly concluded was a more disastrous fate. It was suggested by the court below, and also here in argument, that instead of an outright sale, any one of several alternatives might have been adopted which would have saved the property and preserved competition; but, as it seems to us, all of these may be dismissed as lying wholly within the realm of speculation. The company might, as suggested, have obtained further financial help from the banks, with a resulting increased load of indebtedness which the company might have carried and finally paid, or, on the other hand, by the addition of which, it might more certainly have been crushed. As to that, one guess is as good as the other. It might have availed itself of a receivership,

but no one is wise enough to predict with any degree of certainty whether such a course would have meant ultimate recovery or final and complete collapse. If it had proceeded, or been proceeded against, under the Bankruptcy Act, holders of the preferred stock might have paid or assumed the debts and gone forward with the business; or they might have considered it more prudent to accept whatever could be salvaged from the wreck and abandon the enterprise as a bad risk.

As between these and all other alternatives, and the alternative of a sale such as was made, the officers, stockholders and creditors, thoroughly familiar with the factors of a critical situation and more able than commission or court to foresee future contingencies, after much consideration, felt compelled to choose the latter alternative. There is no reason to doubt that in so doing they exercised a judgment which was both honest and well informed; and if aid be needed to fortify their conclusion, it may be found in the familiar presumption of rightfulness which attaches to human conduct in general. *Bank of the U. S.* v. *Dandridge*, 12 Wheat. 64, 69. Aside from these considerations, the soundness of the conclusion which they reached finds ample confirmation in the facts already discussed and others disclosed by the record.

In the light of the case thus disclosed of a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where its plants were operated, we hold that the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to facilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable, is not in contemplation of law prejudicial to the public and does not substantially

lessen competition or restrain commerce within the intent of the Clayton Act. To regard such a transaction as a violation of law, as this Court suggested in *United States* v. *U. S. Steel Corp.*, 251 U. S. 417, 446–447, would "seem a distempered view of purchase and result." See also *American Press Ass'n* v. *United States*, 245 Fed. 91, 93–94.

For the reasons appearing under each of the two foregoing heads of this opinion, the judgment below must be

*Reversed.*

Mr. Justice Stone, dissenting.

That the facts found by the Commission are a violation of § 7 of the Clayton Act is not questioned. Under § 11, 38 Stat. 730, (U. S. C., Title 15, § 21), the findings of the Commission " if supported by testimony " and the inferences which it may reasonably draw from the facts proved or admitted, are conclusive upon us. See *Federal Trade Commission* v. *Pacific Paper Ass'n*, 273 U. S. 52. Congress has thus forbidden the substitution of the judgment of courts for that of the Commission where it is founded upon evidence. Conforming to this requirement I cannot say that its conclusions here lack the prescribed support. Even without such statutory limitation this Court will not set aside the findings of an administrative board or commission, upheld, as in the present case, by the reviewing court below, unless the record establishes that clear and unmistakable error has been committed. *Cincinnati, &c. Ry. Co.* v. *Interstate Commerce Comm.*, 206 U. S. 142, 154; *Cincinnati, N. O. & T. Ry.* v. *Interstate Commerce Comm.*, 162 U. S. 184, 194; *Illinois Central R. Co.* v. *Interstate Commerce Comm.*, 206 U. S. 441, 466.

The opinion of the Court and the general testimony of petitioner's officers of their conclusions that there was no competition between the two corporations (see *United*

*States* v. *Trenton Potteries Co.*, 273 U. S. 392) seem to proceed on the assumption that manufacturers, each engaged in marketing a product comparable in price and adapted to the satisfaction of the same need, do not compete if they do not sell to the same distributors.

Without stating it in detail, there appears to me to be abundant evidence that the competitive products, made by two of the largest shoe manufacturers in the world, reached the same local communities through different agencies of distribution; the one, of petitioner, through sales directly to retailers throughout the United States, the other, of the McElwain Company, through sales in thirty-eight states, chiefly to wholesalers located in cities, who in turn sold to the retail trade. From detailed evidence of this type the Commission drew, as I think it reasonably might, the inference that the rival products, through local retailers, made their appeal to the same buying public and so were competitive. From a comparative study of the statistics of sales, the Commission might also, I think, reasonably have found that the McElwain Company was successfully competing, by securing by far the larger proportion of the trade in this type of shoe, its gross sales of dress shoes in 1920 being more than $33,000,000 and in 1921 more than $15,000,000, as compared with petitioner's sales of its similar dress shoes of approximately $2,500,000.

No useful purpose would be served by reviewing the evidence at length. To refer to only two of the many items which support the findings of the Commission, the fact relied upon, that petitioner, in the year ending May 31, 1921, sold only 52-5/12 dozen pairs of the competing shoes to dealers patronizing the McElwain Company, would seem to be without significance in the light of other evidence that in one state, Missouri, where petitioner sold its product to 4,801 of the 5,150 retail shoe dealers in the state, the McElwain Company sold in the same

year, chiefly through wholesalers and independent jobbers, 25,669 dozen pairs of the competing product. It appears that in 1921 petitioner sold its shoes to every retailer in Kentucky, Tennessee and Texas. In that year, when the value of the gross sales of the McElwain Company had been cut in half by business depression, it sold in those states 8,791 dozen pairs of its competing product, chiefly through independent jobbers, in addition to its sales in that territory through wholesale houses at Columbus, Ohio, and Chicago.

Apart from the more general testimony that both companies sold extensively in the same states and in the same cities, the inference from this evidence seems irresistible that in these states, as was the case in others,* the competing products were not only offered through different systems of distribution to the same retailers, but were by them offered and sold to the ultimate consumers in their communities. Both products being made and suitable for the same use, the fact that each presented some minor advantages over the other, it might reasonably be inferred, would tend to increase, rather than diminish the competition. In fact, the chairman of petitioner's board of directors testified that its 500 salesmen were unsuccessful in their efforts to increase the sales of its Patriot Brand of dress shoes (the alleged competitive product) above about 3,000 pairs a day because they were unable to convince retailers of the superiority of petitioner's more serviceable dress shoes over the better

---

* The petitioner sold to three retail dealers in every four in Illinois. The McElwain Company sold 9547 dozen pairs of competing shoes to independent jobbers and retailers in that state. In addition, an affiliated wholesale house located in Chicago sold about 18,000 dozen pairs. In California, where the International Shoe Company sold to seven retail dealers in every ten, the McElwain Company sold 1586 dozen pairs to retailers and independent jobbers; and an affiliated wholesaler located at San Francisco sold, almost wholly within the state, about 10,000 dozen pairs of the competing shoes.

looking dress shoes of the type manufactured by the McElwain Company.

Nor am I able to say that the McElwain Company, for the stock of which petitioner gave its own stock having a market value of $9,460,000, was then in such financial straits as to preclude the reasonable inference by the Commission that its business, conducted either through a receivership or a reorganized company, would probably continue to compete with that of petitioner. See *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 356, 357. It plainly had large value as a going concern, there was no evidence that it would have been worth more or as much if dismantled, and there was evidence that the depression in the shoe trade in 1920–1921 was then a passing phase of the business. For these reasons and others stated at length in the opinion of the court below, I think the judgment should be affirmed.

MR. JUSTICE HOLMES and MR. JUSTICE BRANDEIS concur in this opinion.