NORTHWEST AIRLINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

United Air Lines, Inc., Capital Airlines, Inc., Intervenors.

DELTA AIR LINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

United Air Lines, Inc., Capital Airlines, Inc., Intervenors.

EASTERN AIR LINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

United Air Lines, Inc., Intervenor.

Nos. 16355, 16356, 16396.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 6, 1961.

Decided Jan. 25, 1962.

396

Mr. Hans A. Klagsbrunn, Washington, D. C., with whom Messrs. Lawrence D. Hollman and Emory T. Nunneley, Jr.,

Washington, D. C., were on the brief, for petitioner in No. 16355.

Mr. Richard S. Maurer, Atlanta, Ga., with whom Messrs. James W. Callison, Washington, D. C., and Frank F. Rox, Atlanta, Ga., were on the brief, for petitioner in No. 16356. Messrs. Joseph J. O'Connell, Jr., and Robert Reed Gray, Washington, D. C., also entered appearances for petitioner in No. 16356.

Mr. Allison Wade, Atlanta, Ga., of the bar of the Supreme Court of Georgia, pro hac vice, by special leave of court, for petitioner in No. 16396. Mr. Harold L. Russell, Atlanta, Ga., was on the pleadings for petitioner in No. 16396.

Mr. O. D. Ozment, Associate Gen. Counsel, Litigation and Research, Civil Aeronautics Board, with whom Mr. John H. Wanner, Gen. Counsel, Civil Aeronautics Board, Mr. Joseph B. Goldman, Deputy Gen. Counsel, Civil Aeronautics Board, Mr. William F. Becker, Atty., Civil Aeronautics Board, and Mrs. Richard A. Solomon, Atty., Dept. of Justice, were on the brief, for respondent.

Mr. H. Templeton Brown, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Messrs. Robert L. Stern, Chicago, Ill., and James Francis Reilly, Washington, D. C., were on the brief, for intervenor United Air Lines, Inc.

Mr. Macon M. Arthur, Washington, D. C., entered an appearance for intervenor Capital Airlines, Inc., in Nos. 16355 and 16356.

Before WILBUR K. MILLER, Chief Judge, and PRETTYMAN and FAHY, Circuit Judges.

PRETTYMAN, Circuit Judge.

Nos. 16355 and 16356 are petitions to review an order of the Civil Aeronautics Board, which approved a merger of United Air Lines, Inc., and Capital Airlines, Inc. Petitioners, who were intervenors before the Board, are certificated air carriers, and their interest is the alleged competitive impact of the merger upon their respective operations.

Capital was the fifth largest domestic trunkline carrier. Its certificated routes extended from Minneapolis-St. Paul eastward to New York and thence south to New Orleans and Miami. In 1955 it purchased a fleet of Viscount aircraft from Vickers-Armstrong, Ltd., the British manufacturer, giving chattel mortgages on the planes, and promissory notes, in the amount of $66,700,000. Thereafter it fell upon hard times. It operated at a loss after 1955; its net worth declined from $17,000,000 in that year to $3,695,- 000 in 1960. It defaulted in its payments to Vickers, and Vickers instituted foreclosure proceedings. Capital, as the Board said later, was *"in extremis"*.

The Board instituted several proceedings of investigation and inquiry, considering subsidies, the alteration of certificates, the transfer of routes, and merger possibilities. At that point, July 28, 1960, United came forward, having been approached by Capital, with an offer to acquire Capital. After hearings before an examiner, an initial decision, and argument on exceptions, the Board rendered findings and conclusions at some length. It approved the merger.

Before entering upon consideration of the legal points advanced by counsel, we pause to note the plain, hard problem faced by the Board. This was a naked crisis of practical realities. The fifth largest carrier in the country was about to disappear. There was nothing artificial about the problem; nobody urged it or encouraged it or intentionally created it. It came about through the operation of impassive economic forces. It was real. It was not an academic speculation. Sometimes mergers are arranged by the parties as desirable forward steps in some plan deemed by both to be a good one. The present merger was not of that sort. Neither of the parties to it liked it; neither wanted it. It was an emergency crash measure. Opening its opinion the Board said:

> "In essence, the Board has decided to approve the merger of Capital and United because it has no practicable alternative. Notwithstand-

ing the claims to the contrary, the simple fact is that Capital is financially *in extremis* and will not survive if the merger is disapproved."

The legal problems posed to us must be examined under the light of those facts. It is very well to theorize in hindsight about possibilities; but a regulatory agency must sometimes deal with immediate crises upon a realistic judgment of the moment. To be sure, it cannot be excused for mistakes thus made; but the area of permissible discretion can be measured in terms of the situation then existing.

We also note at this point the attitude of United in the matter, since a thread of criticism of that attitude seems to run through much of the argument. The record does not picture United as an enthusiastic proponent of the merger. It did not ask the Board to specify the terms and conditions upon which an acquisition might be approved. It did not offer to become a party to a merger, terms to be agreed upon or fixed. United appears to have been a willing party, but no more. It was agreeable to a certain contract but to none other. It was willing to buy at a certain price and upon certain terms, but at no other price and on no other terms. It made its offer. Nobody else made any offer. Those who now say that Capital might have been dismembered and sold off in pieces did not then come forward with proffers of prices or terms.

■ United's action and attitude seem to us to have been those of normal business. As commonplaces of the business world, men make offers and stand upon them. Of course negotiating and bargaining are also commonplace. But the submission of one offer, and one only, is a familiar procedure. It is the core of competitive bidding and of one-price policies. No moral, legal or economic principle dictates that there must be a counter-offer to every offer. Men and nations make offers and stand upon them; indeed this process is often more honest than is a proposal designed for bargaining purposes. United was interested in a certain purchase, at a certain price, and upon certain terms. It made its offer, fully and frankly. It stood on it. It was interested in nothing else. We see no shadow of impropriety or of the unusual in its position. And this position was one of the factors in the proceeding.

Petitioner Northwest Airlines, Inc., is a certificated carrier serving routes principally across the northern part of the United States (with extended service to Alaska, Tokyo, Hong Kong, Honolulu, and south from Chicago to Miami). In its sectors from Minneapolis-St. Paul east to New York, it serves many of the markets formerly served by both United and Capital, and which are now served by United alone. The Board's order, says Northwest, approving the merger substantially as proposed, has a direct adverse effect upon it.

Delta Air Lines, Inc., is a certificated carrier serving, principally, routes in the eastern section of the United States, such as the north-south routes from Chicago, Detroit and New York to Houston, New Orleans and Miami. Significant segments of Capital's north-south routes paralleled routes served by Delta. Delta says, for example, that on Route 51— New York, Philadelphia, Atlanta and New Orleans—Capital, although certificated, had been only a minor participant and in many of the segments of the route its operating authority had become virtually dormant. Delta urged that Capital's certificate for this route be suspended, terminated, or sold to Delta; and that these determinations be included in the merger proceeding. Delta also argued that in the Chicago-New York area the merger inevitably resulted in "monopoly gaps", meaning certain markets in which United and Capital had been the only carriers or had carried an overwhelming majority of the traffic.

Eastern Air Lines, Inc., petitioner in No. 16396, is a certificated carrier, serving an elaborate system of routes over the eastern half of the United States. Its motions for stay and remand are, principally, to prevent United from reactivating allegedly unused, dormant or

abandoned operating rights formerly used by Capital and, procedurally, to remand the case to the Board for further consideration of the transfer of those rights from Capital to United.

Petitioners say the minimum legal requirements for the scope of the full, fair and meaningful hearing to which they were entitled are absent here. Specifying, they say the hearing did not include full exploration of alternative proposals, or full consideration of terms, conditions and modifications which might have been imposed, that certain essential issues were erroneously deferred; and that the Board's order of July 25, 1961, ordering an investigation of the need for competitive service, is no substitute for the legal requirements of the scope of the hearing on the merger itself.

This particular proceeding began when United and Capital filed a joint application requesting approval of a merger agreement. The agreement provided, *inter alia multa*, that all of Capital's certificates would be reissued to United. It set a date, February 1, 1961, for unilateral rescission if the agreement were not by then approved. It provided for certain stated exchanges of United stock for Capital stock and debentures, and for a readjustment of the then-$34,000,000 Vickers debt. Vickers concurred. The Board assigned the application to an examiner. Petitioners (intervenors before the Board) sought to have the proceeding expanded so as to include a general investigation into the affairs of Capital. They also made efforts to include consideration of the deletion or suspension of points from the certificates to be reissued, and of route suspensions or modifications and also of possible route transfers to other carriers. They made efforts to include consideration of alternative solutions to Capital's problems. To all of these motions Capital and United filed a joint answer, stating, in part: "The granting of the foregoing requests * * * would, without more ado, terminate the proposed merger between United and Capital."

The situation was thus crystal clear. United was interested in acquiring Capital upon certain terms but upon no other terms. Our petitioners, frankly combating the possibility of a new and powerful competitor in place of a weak, partially moribund one, sought to have the Board inquire into all alternatives theoretically possible, although none was advanced as a firm proposal, and into all conditions theoretically practical, although none was suggested as acceptable to the sole vendee of the properties. The Board made what seems to us to be a clear and proper decision. It said what it would and what it would not do. It said it would consider the merger agreement presented to it, considering all aspects of it and all parts of it, and determine whether in its judgment the proposal was in the public interest and whether in some parts, but not in other parts, it was in the public interest. The Board said it would not consider in this proceeding possible alternatives, possible additional or different terms or conditions. In other words the Board said, in effect: We will consider what is before us and pass upon that; we will not now embark upon a general inquiry into the troubles of Capital, or into a reexamination of the route structure in the whole of the eastern half of the country.

The approval or non-approval of the merger as proposed was fully probed; all evidence proffered on that issue was received. The question whether any parts of Capital's routes should be held out of the merger (i. e., withheld from United) was fully explored, all evidence received, and the point decided. Upon this narrow phase of the controversy the arguments are profuse and complicated. The point is called the "non-transfer point", meaning whether some of Capital's certificates, or parts of those certificates, should not be transferred to United. Various counsel make various arguments based on extracts from various statements and rulings of the examiner. Specifically, they claim they were precluded from offering evidence on the non-transfer point. We have read

much of the cited record, and it seems clear to us that this point was always treated as an issue and all evidence proffered in respect to it was received. In its opinion the Board said:

"In considering the propriety of the procedures employed by the Board, we believe it is important to point out that the intervening carriers have been free at all times in this proceeding to demonstrate by evidence and argument that various portions of Capital's system should not be available for operation by United if the merger is approved. The mere fact that the Board did not consolidate route *transfer* issues into this case has not in any way foreclosed the freedom of the Board in placing limitations on United's operating rights subsequent to the merger. To the extent that the Board has been convinced that United should not fall heir to parts of Capital's system, the Board has effectively taken action by appropriate conditions to protect the intervenors, e. g., Allegheny and Mohawk."

On the other hand the Board did not include as issues two variations of the theme respecting Capital's routes: (1) whether some of those routes should simply be suspended or deleted, i. e., taken out of the air service picture, and (2) whether some of those routes should be transferred to other carriers. In sum the Board considered the issues inherent in the merger proposal, i. e., what should or should not be transferred to United, but it refused to go outside the merger problem into matters of suspension or deletion or other carriers' acquisitions.

■ In so far as the intervening parties sought to require the Board to enter upon a general investigation of Capital and its troubles, reopening an investigation along those lines which was abandoned when the concrete proposal was projected, the question is quickly solved. The Board is to a great degree master of its own calendar, and it can consider separate proposals separately if it wishes to do so. It cannot thereby impinge upon others' rights or force artificial results by piecemeal dispositions, but we find no such difficulty in this phase of the matter now before us.

■ Nor does it seem to us that the contention that the Board need have considered, as a prerequisite to its disposition of the merger agreement before it, the dismemberment of Capital and its distribution in parts to unknown prospective purchasers, can be sustained. The situation with which the Board was faced was a very real one, and it was not required to wander preliminarily into what might be fanciful byways. If other proposals, concrete in terms, had been put before it, other courses might have been required in this respect.

We come, then, to the more elusive problem. Section 408 of the statute [1] deals with mergers. Subsection (b) provides that parties seeking a merger shall present an application and the Board shall hold a public hearing. It provides that, unless the Board finds the merger "will not be consistent with the public interest", it shall approve it. The negative in which this provision is cast is to be noted. It is the reverse of the findings requisite for certificates or suspensions, as we shall see in a moment. The merger provision (Sec. 408) further provides that the Board shall approve "upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe". This is one of the cores of the present dispute. Petitioners take the position that the suspension or deletion of Capital's routes (i. e., their elimination from the air route map) and the transfer of its routes to other carriers are "terms" or "conditions" or "modifications" of the merger agreement. The Board says they are not, that they are separate matters; that if they are desirable results the merger should be rejected and these matters taken up separately in proceedings for

1. Federal Aviation Act of 1958, 72 Stat. 767, 49 U.S.C. § 1378.

that purpose. We agree with the Board's view. We think a merger application does not open for re-determination the whole route structure of a vast area of the country.

The point is vivified by a look at Section 401 of the statute. Subsection (d) of that section deals with the issuance of certificates (which would be necessary if some of Capital's routes were to be assigned to other carriers); and subsection (g) deals with modifications or suspensions. The former subsection provides that in order to approve the application the Board must find "that such transportation is required by the public convenience and necessity". The latter subsection provides that the Board may modify or suspend "if the public convenience and necessity so require". Thus the statute permits issuance, modification or suspension of certificates only upon affirmative findings of public convenience and necessity as requiring the action. But as to mergers it requires approval unless public interest prevents.

■■■■ It seems to us that this congressional plan does not contemplate that acts involving carriers not parties to a merger agreement (e. g., the issuance to them of certificates) need be treated as terms, conditions or modifications of the merger agreement. Nor do we think that the congressional plan contemplates that matters outside the merger agreement (i. e., route revisions by way of deletions) need be attached to it artificially for procedural reasons. So far as all these potential steps involve the parties to the merger, e. g., so far as the non-transfer to United of some of these routes, is concerned, the issues are in the merger proceeding. This may be an elusive line to follow, but it is a clear line and an important one. To illustrate, whether Route 51 should or should not be transferred to United as part of the merger is and was properly an issue. Whether Route 51 should for any of many reasons be suspended, deleted, stricken from the route pattern, or whether it should be sold to Delta, and if so for what price and upon what terms, were and are not

issues in the merger proceeding. The Board considered the desirability of these suggested steps outside the merger agreement as possible reasons for rejection of the agreement. And it also set them down for hearing and disposition in a separate proceeding designed for that purpose. We think the Board acted within the area of its permissible discretion in the course it followed.

■■■ Petitioners next say the Board erred in so treating Capital's failing condition as to preclude inquiry into other customary and essential monopoly and antitrust considerations under the First Proviso of Section 408(b) of the statute. This proviso is that "the Board shall not approve any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract, or acquisition of control". The proviso was clearly aimed, in both language and intendment, at mergers which would *create* monopoly. The merger in the matter at bar did not create or tend to create monopoly. Indeed it probably, as the Board found, forestalled or at least cushioned a monopolistic development. There were a few segments of the total routes in which only one carrier was left (including four major "markets"), but these were minor in the whole picture. An erstwhile hearty competitor in a vast area was about to collapse and pass from the picture. Had this happened, the field would have been left to the remaining operators, thus with less competition and closer to monopoly. As it was, the merger brought a new and hearty competitor into the area. Those already there had more competition and thus less monopoly than they had theretofore had. We agree with the Board that this proviso of Section 408 had little to do with this problem. The United States Government seems to support this view, as the brief to that effect is signed by the head of the Antitrust Division of the Department of Justice.

Counsel argue this point in terms of the "failing business doctrine" and the International Shoe case.[2] We think we need not try to fit this problem as we have it, into ready-made doctrinaire styles or sizes; the matter is clear enough on the face of the facts and the statute without intermediate measurements.

What we have said concerning the relationship between Sections 401 and 408 of the statute is sufficient to cover the contentions of Eastern concerning the necessity for the Board to consider separately the transfer to United of Capital's allegedly dormant routes or route segments.

The order of the Board is affirmed, and Eastern's motions for stay and remand are denied.

So ordered.

---

**2.** International Shoe Co. v. Federal Trade Comm'n, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930).