**MIDCON CORP., a Delaware Corp., Plaintiff,**

v.

**FREEPORT–McMORAN, INC., a Delaware Corp.; FMI Acquisition, Inc., a Delaware Corp.; Wagner & Brown, A Texas Partnership; Cyril Wagner, Jr.; Jack E. Brown, the sole partners of Wagner & Brown; Coach Acquisition Inc., a New York Corp.; WB Partners, a Texas General Partnership; BW Partners, a Texas General Partnership, Defendants.**

No. 85 C 10573.

United States District Court, N.D. Illinois, E.D.

Jan. 13, 1986.

John T. Cusack, Gordon B. Nash, Jr. and Thomas Campbell, Gardner, Carton & Douglas, Chicago, Ill., for plaintiff.

James A. Klenk, Don H. Reuben and Paula E. Litt, Reuben & Proctor, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

DUFF, District Judge.

This matter comes before the court on the plaintiff's motion for a preliminary injunction. Plaintiff MidCon Corporation ("MidCon") is the owner of a pipeline system which supplies natural gas to the St. Louis and Chicago areas, among others. Defendants Freeport-McMoran, Inc. ("FMI"), Wagner & Brown ("Wagner and Brown"), Cyril Wagner, Jr., Jack E. Brown, Coach Acquisition, Inc. ("Coach"), WB Partners, and BW Partners, own or are affiliated with persons owning substantial natural gas properties in the United States.

On December 16, 1985, defendants announced a tender offer to acquire all outstanding shares of common stock of Mid-Con. MidCon asks this court to enjoin the acquisition alleging that it would violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and § 7 of the Clayton Act, 15 U.S.C. § 18. Section 7 of the Clayton Act provides in relevant part:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share

capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, *where, in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.* (Emphasis added.)

It should be noted that the hearing before the court was conducted on an emergency basis due to the possibility that a Federal Reserve Board rule, originally scheduled to take effect January 1, 1986, might affect the defendants' ability to finance this proposed merger. After hearing two days of live testimony and considering the affidavits and depositions submitted, the court denied plaintiff's motion for a preliminary injunction. The court ruled orally on December 30, 1985. As stated then, to the extent that anything in this opinion is contrary to the oral ruling, the written opinion is controlling.

## FACTS

Plaintiff bases its antitrust claim on the possibility that the defendants, once they gain control of the pipelines owned by MidCon's subsidiaries, will force those subsidiaries to purchase gas from the defendants at inflated prices, resulting in higher gas prices for MidCon's utility customers and, ultimately, for consumers. Nearly all of plaintiff's evidence was presented in an attempt to support this argument.

One MidCon subsidiary, Natural Gas Pipeline Company of America ("Natural"), supplies natural gas to the Chicago area. Another subsidiary, Mississippi River Transportation Corporation ("MRT") supplies natural gas to the St. Louis area. In addition, MidCon recently acquired United Energy Resources, Inc. ("United Energy"), which apparently supplies gas to other areas of the country. There has been little evidence concerning United Energy.

Natural and MRT purchase gas from producers and transport it through their pipelines for sale to utility companies. The companies also do some transporting business where they merely transport gas which the utilities have bought directly from the producers.

Natural buys gas in all the significant gas producing basins, onshore and offshore, in the United States with the exception of the East Coast. It buys from major producers such as Texaco, Chevron, Shell, and Exxon, as well as from independent producers. Approximately 700 to 800 producers sell to Natural, although 20 of these producers supply approximately 80% of Natural's gas.

Natural supplies approximately 75% of the gas consumed in the Chicago area. It sells to Northern Illinois Gas Company, People's Gas, Light and Coke Company, North Shore Gas, Northern Indiana Public Service Company, and Iowa Illinois Gas & Electric. Natural also sells to MRT.

Plaintiff's theory that defendants would force high priced gas into MidCon's pipelines rests on what it called MidCon's "captive market". According to James J. McElligott, Natural's Assistant Vice President for rates, Natural has a captive market in the Chicago area because its competitors have the capacity to supply only 200 to 300 billion cubic feet ("bcf") of the 700 to 900 bcf of gas consumed in the Chicago area. This leaves a demand for 500 to 600 bcf that can be filled only by Natural.

Plaintiff presented no evidence on the feasibility of building new pipelines, nor did it present significant testimony concerning the availability of alternative fuels or the price elasticity of demand for natural gas in the Chicago market. McElligott did testify, however, that some large industrial users have the capacity to use alternative fuels but that the typical homeowner is unable to switch to other energy sources.

MRT sells to Fleet Gas Company, Illinois Power Company and Laclede Gas Company which provide gas for the areas in and around St. Louis, Missouri, and St. Charles, Illinois. It is alleged that MRT supplies

90% of the gas consumed in the St. Louis area. Plaintiff did not provide any evidence on the capacity of other pipelines to supply gas to the St. Louis area. Indeed, there has been no explanation as to how the remaining 10% of the St. Louis market is supplied. There is no evidence of the capacity of other pipelines to serve that market or whether any competition is anticipated. Further, plaintiff provided no evidence concerning the source of MRT's gas, except to state that Natural sells some gas to MRT.

Plaintiff's witnesses testified extensively about its policy of purchasing gas at the lowest available price, apparently assuming that the defendants would abandon such a policy upon taking control of MidCon. Plaintiff buys some of its gas (the evidence does not indicate what percentage) under "take-or-pay" contracts. Under a take-or-pay contract, the pipeline company must take a certain minimum quantity of gas per year, or else be liable for the difference between that quantity and the quantity actually taken. Plaintiff says that it has been able to keep its prices low by taking a strong position in contract negotiations and by taking advantage of the latitude which these contracts allow.

McElligott attempted to establish a comparison of the prices charged by the defendants and those charged by the plaintiff. Natural's average price for gas under contract is $2.53 per thousand cubic foot ("mcf"). McElligott also testified that Natural makes "marginal purchases" at $1.90 per mcf. Although this testimony is somewhat unclear, apparently Natural is able to make these purchases by taking the minimum amounts required under take-or-pay contracts and then making purchases on the open market to meet the demand. In considering Natural's prices, McElligott ignored the fact that as of January 1, 1986, Natural will have incurred approximately $1 billion in take-or-pay liability.

McElligott compared these prices to defendants' average price for gas, which he said was $4.03 per mcf during a recent six-month period. McElligott obtained this figure by analyzing statements which were filed with the Federal Energy Regulatory Commission ("FERC") by defendants' customers. McElligott did not know whether this price was for gas being sold under contract, and could not testify as to the economic or historical conditions that might explain the $4.03 price. McElligott was also unable to exclude the possibility that this price might be attributable to defendants' foresight in signing customers to long-term contracts during times when gas prices were higher. There was no testimony that the defendants are currently entering into agreements to sell gas at prices that exceed the prevailing market price.

Using these suspect figures, McElligott calculated what the impact would be if Natural was forced to buy gas from defendants. He based these projections on a newspaper article in which the following statement appeared:

> McMoRan Oil & Gas Co., FMI's petroleum subsidiary, cannot sell 60 percent of the gas that it is capable of delivering in today's glutted market, Moffett [Mr. James R. Moffett, Chairman of Freeport-McMoran] said. MidCon's pipeline network would be a big help, he said.

In his deposition Moffett explained that almost all of that gas is already committed to its customers under long-term contracts and could not be shifted to MidCon. Thus, plaintiff failed to show that defendants have gas available to force into MidCon's pipelines.

In addition to the evidence about the particular policies of these parties, plaintiff's witnesses testified that generally, it is important for a pipeline to be independent from producers. Dan H. Grubb, President of Natural, testified that a pipeline company makes money by investing in pipelines and therefore has an incentive to keep prices low. A producer, on the other hand, makes money on the spread between the cost of finding the gas and the ultimate sales price and, thus, Grubb concluded, defendants would be motivated to keep prices high. Other than this vague speculation, plaintiff failed to provide any real evidence

that defendants would, in fact, pursue such a high pricing policy which would be contrary to their own economic interests.

While urging the importance of independence between pipeline and producer, Natural acknowledged that it owns two gas-producing subsidiaries. Grubb testified that in 1985, Natural produced 51 bcf of natural gas. Defendants' combined production for 1984 was approximately 60 bcf. Grubb testified that despite the fact that both MidCon and the defendants are substantial gas producers, the relationship between MidCon and its gas-producing affiliates differs from the relationship MidCon would have with the defendants. Grubb did not adequately explain how or why MidCon's relationship with Natural would be different and seemed to rely on the "great personalities" of the defendants in predicting that they would force Natural to take its gas.

In addition to this analysis of the relevant markets and pricing policies of the parties, evidence was presented concerning the policies and procedures of the FERC, a federal agency with the power to regulate gas prices. Grubb and McElligott testified that although pipeline companies must submit their pricing policies for review by the FERC every six months, neither of them knew of any instance when the FERC had rejected a pipeline's request for a price increase. Both, however, acknowledged the FERC's power to reject unreasonable price increases, and admitted that at times the FERC has granted only conditional approval to price increases.

The FERC also has significant rule-making power and is currently considering a rule, discussed in plaintiff's annual report, that would allow utilities to deal directly with the producer and avoid purchasing gas through pipeline companies. This court also took judicial notice of a proceeding before the FERC in which one of Natural's competitors alleged that it had violated a FERC rule which limits transactions between pipeline companies and their gas producing affiliates.

Plaintiff also sought to introduce evidence that defendants' highly leveraged acquisition of MidCon would financially damage MidCon by increasing its debt and reducing its capital. The court excluded this testimony because plaintiff was unable to show that the financial condition of MidCon could affect competition.

## DISCUSSION

In determining whether to issue a preliminary injunction, the court must consider four factors: (1) whether plaintiff has an adequate remedy at law or will suffer irreparable harm if the injunction is denied; (2) whether this harm will be greater than the harm defendant will suffer if the injunction is granted; (3) whether plaintiff has shown a reasonable likelihood of success on the merits; and (4) whether the public interest will be affected by the issuance of an injunction. *General Leaseways, Inc. v. National Truck Leasing Association,* 744 F.2d 588, 590 (7th Cir.1984); *Roland Machinery Company v. Dresser Industries, Inc.,* 749 F.2d 380, 382 (7th Cir.1984).

In *American Hospital Supply Corporation v. Hospital Products Limited,* 780 F.2d 589, 593 (7th Cir.1986), Judge Posner reduced these factors to an algebraic formula and directed a district judge to

"grant the preliminary injunction if but only if $P \times H_p > (1-P) \times H_d$, or, in words, only if the harm to the plaintiff if the injunction is denied, multiplied by the probability that the denial would be an error (that the plaintiff, in other words, will win at trial), exceeds the harm to the defendant if the injunction is granted, multiplied by the probability that granting the injunction would be an error."

There is the potential here for irreparable injury on both sides of Judge Posner's equation. If this proposed merger violates § 7 of the Clayton Act, and it is not enjoined, plaintiff would suffer an irreparable injury. After the takeover, it would be virtually impossible to "unscramble the eggs" and return the two companies to the status quo.

On the other hand, if the proposed merger does not violate the Clayton Act and the defendants are enjoined, it might be difficult to make the defendants whole with a money judgment. It is difficult for the court to say that these defendants would be injured, however, since the court cannot predict what the loss would be if the takeover were erroneously enjoined. There are incalculable contingencies—actions by regulatory agencies, MidCon's rescue by a "white knight", actions by shareholders, changes in the natural gas market—which could obstruct this merger or make it unprofitable for the defendants. Nonetheless, courts have held that blocking an otherwise lawful tender offer is an irreparable injury.

In *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Supreme Court discussed the injuries which flow from an injunction against a takeover as follows:

> The effects of allowing the [injunction of] a nationwide tender offer are substantial. Shareholders are deprived of the opportunity to sell their shares at a premium. The real-location of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced.

457 U.S. at 643, 102 S.Ct. at 2641. *See also Dan River, Inc. v. ICAHN*, 701 F.2d 278, 283–84 (4th Cir.1983); and *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir.1982).

As in *American Hospital Supply Corporation*, the magnitude of injury to the plaintiff if the injunction were erroneously denied is nearly equal to the injury to the defendants if the injunction were erroneously granted. Thus, under Judge Posner's formula, plaintiff must show "a better than 50 percent chance of winning the case". The court is hesitant to handicap a judicial contest and apply percentages to the likelihood of success on the merits; however, in this case plaintiff's chances of success can only be characterized as a long shot.

■ While the traditional threshold for establishing likelihood of success on the merits is low, plaintiff has failed to present any evidence, or even any argument to suggest that it could ultimately prevail against these defendants. Under § 7 of the Clayton Act as quoted above plaintiff must show that this proposed merger may substantially lessen competition or tend to create a monopoly in any line of commerce and in any section of the country. In *Brown Shoe v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court set forth the method for identifying violations of § 7. The court must determine the line of commerce or the relevant product market, the relevant section of the country or the geographic market, and whether the merger may substantially lessen competition.

There is no dispute that the line of commerce is the sale of natural gas. There is, however, a dispute over the relevant geographic market. At issue is whether the court should look at competition among natural gas producers at the top end of the pipeline (a nationwide market) or among utility companies who purchase gas at the bottom end of the pipeline for distribution to the ultimate users (a local market).

In *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Court stated that the "proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." 374 U.S. at 357, 83 S.Ct. at 1738. The difficulty in determining the relevant market here is that plaintiff has failed to show that this merger will affect or lessen competition in either the producer or the utility market.

In *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court stated that in determining whether a merger lessens competition, the nature and pur-

pose of the merger, the trend toward concentration in the industry and the size of the share of the market foreclosed by the merger should be considered. Plaintiff's basic argument is that after the merger, defendants would force high-priced gas into MidCon's pipelines. The court cannot determine how this argument meets the *Brown Shoe* requirements or establishes that the merger will lessen competition, perhaps because plaintiff's evidence does not support his argument.

■ Plaintiff did not provide any reliable evidence on which to base a finding that defendants will increase prices once they take control of the pipeline. Such a finding cannot be based on a showing of plaintiff's good management, on personalities, on speculation about what defendants will do with the pipeline, or on what defendants, as producers, have done in the past—under different economic conditions. There is no adequate evidence here to show that the defendants would treat the utilities or other producers any differently than MidCon has. Defendants will be under the same economic and regulatory restraints in setting prices as MidCon has been.

■ In considering whether a merger violates § 7 of the Clayton Act, courts generally look at the evidence in light of the factors originally set forth in *Brown Shoe*, which have been further defined and elaborated on in subsequent decisions. In *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345 (2d Cir.1979), the court discussed the *Brown Shoe* analysis as follows:

> [M]ost important among the factors are the nature and economic purpose of the arrangement, the likelihood and size of any market foreclosure, the extent of concentration of sellers and buyers in the industry, the cost required to enter the market, the market share needed by a buyer or seller to achieve a profitable level of production (sometimes referred to as 'scale economy'), the existence of a trend toward vertical concentration or oligopy in the industry, and whether the merger will eliminate potential competition by one of the merging parties. To

these factors may be added the degree of market power that would be possessed by the merged enterprise and the number and strength of competing suppliers and purchasers, which might indicate whether the merger would increase the risk that prices or terms would cease to be competitive. This list, with some variations, has been the standard framework for analysis of the legality of a vertical merger. [citations omitted.]

603 F.2d at 353. Plaintiff provided no evidence which would allow the court to consider any of these factors. Without such evidence, the court is unable to see how plaintiff can establish that this merger might lessen competition in violation of § 7 of the Clayton Act.

While the defendants would acquire a substantial percentage of the market at the utility end of the pipeline, it is no different from that percentage of the market now controlled by the plaintiff. The merger will, therefore, not affect the market at the utility end of the pipeline. The vertical merger would appear to have the potential to affect the market at the producer end of the pipeline. Yet, plaintiff provided no evidence on the market of natural gas producers, on defendants' percentage of that market, or on the likelihood that defendants would foreclose any other producers from the natural gas market.

■ Failing to meet its burden under the traditional method of analysis applied in Clayton Act cases, plaintiff tried a more novel approach and asked this Court to apply the "failing company defense" in reverse. Under the failing company defense, first set forth in *International Shoe Co. v. F.T.C.*, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930), a merger may be justified if the target company is in such a weak financial position that it will collapse if not acquired by another, stronger, company.

Plaintiff attempted to show that the financial arrangements for the merger would force MidCon to assume such a massive amount of debt that MidCon would collapse. Common sense suggests that

these defendants do not plan to purchase MidCon only to watch it fail. It is also highly unlikely that the defendants could secure financing for such an unpromising venture.

Even if the reality here was contrary to such obvious common sense, that would not establish a violation of § 7 of the Clayton Act. The fact that antitrust law permits the acquisition of a failing company by a competitor does not justify enjoining the acquisition of a healthy company on the ground that its financial integrity might be hurt by the acquisition. The critical issue is the impact on competition. Under the failing company doctrine, the effect on competition if the target company collapses is considered greater than if the company is acquired by a stronger company, *United States v. General Dynamics*, 415 U.S. 486, 506–7, 94 S.Ct. 1186, 1198–99, 39 L.Ed.2d 530 (1974). Even if this merger were to result in financial ruin for MidCon, plaintiff has not shown that this will have an adverse effect on competition.

It is clear from the foregoing that plaintiff has a negligible chance of succeeding on the merits. When this is multiplied against the equality of potential injury to each party, Judge Posner's formula looks like this: $P \times H_p < (1-P) \times H_d$ and plaintiff's request for a preliminary injunction should be denied.

At first blush, Judge Posner's formula seems to ignore the public interest. The public interest, however, may be factored with the injury on either side of the equation, depending on where the public interest lies. See *American Hospital*, at 601–602.

■ The court carefully considered how the merger of these two corporations would affect the public. The public may be affected by the fact that such a large percentage of the market is supplied by a single pipeline. The court cannot say, however, that the public would be affected by a change in the ownership of that pipeline. Furthermore, there are many government agencies monitoring the natural gas industry and protecting the public interest.

Thus, an examination of the public interest in the issuance or denial of an injunction in this case does not add anything to either side of the equation.

For these reasons, plaintiff's motion for a preliminary injunction has been denied.